[Cite as *State v. Reynolds*, 2018-Ohio-40.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


State of Ohio                                          Court of Appeals No. L-16-1080

      Appellee                                    Trial Court No. CR0201501852

v.

Darnell Reynolds                                    **DECISION AND JUDGMENT**

      Appellant                                    Decided:  January 5, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Claudia A. Ford, Assistant Prosecuting Attorney, for appellee.

Stephen D. Long, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Darnell Reynolds, appeals the April 11, 2016 judgment of the

Lucas County Court of Common Pleas sentencing him to 33 years in prison.  For the

following reasons, we affirm.

## I. Background and Facts

{¶ 2} On May 22, 2015, Reynolds was indicted on three counts of rape in violation of R.C. 2907.02(A)(2) and (B) and one count of aggravated robbery in violation of R.C. 2911.01(A)(1), all first-degree felonies. Two of the rape counts and the aggravated robbery count included firearms specifications under R.C. 2941.145. The charges stemmed from the rapes of three victims in 2010 and 2011.

{¶ 3} The case was tried to a jury beginning April 4, 2016. The state presented the testimony of 19 witnesses, including officers and detectives who investigated the incidents underlying the indictment; three sexual assault nurse examiners ("SANE"); three analysts from the Bureau of Criminal Investigation ("BCI"); the three victims; and one victim's mother. Reynolds also presented a witness. The following facts were developed at trial.

### A. August 4, 2010 Rape

{¶ 4} On August 3, 2010, B.B. ("victim 1") was arrested for disorderly conduct and taken to the Lucas County jail. She was released on August 4, 2010, around 3:00 or 4:00 a.m. She testified that while she waited outside the jail for a ride home she saw a man walking back and forth in front of the jail. She described him as thin, African-American, about her height, in his early 30s, and wearing a white tank top and black shorts with a white stripe down the sides. She asked the man for a cigarette. When she approached him, he put something hard that victim 1 believed was a gun against her back and told her to walk or he would kill her. She said that they walked approximately a

2.

quarter of a mile from the jail before he stopped at an abandoned building and told victim 1 to lie down. Victim 1 testified that the man removed her pants and underwear and then penetrated her vagina with his penis. While he raped her, victim 1 said that the man reminded her that he had a gun and told her that he would kill her. When the man finished, he told victim 1 to run. She ran from the scene to the jail where she reported that she had been assaulted. Officers took her in a police cruiser to find the scene of the rape. When they found the building, the officers observed an area of matted grass and found victim 1's booking papers from the jail in the area where she reported that the rape occurred.

{¶ 5} The officers then took victim 1 to Mercy St. Vincent Medical Center where she underwent a rape examination. Victim 1 described what happened during the examination, including the SANE swabbing her vagina and taking pictures of her injuries.

{¶ 6} Tiffany O'Neal, the SANE who examined victim 1, testified. O'Neal collected swabs for forensic testing, which she documented using a rape kit and instructions provided by the state. O'Neal documented and took photographs of bruises and abrasions on victim 1's shoulder, back, and legs and two small vaginal tears. O'Neal also swabbed victim 1's vagina, anus, and mouth; took scrapings from under her fingernails; and collected her clothes to include in the rape kit. The state asked O'Neal to read victim 1's account of the events that O'Neal documented in the rape kit paperwork.

3.

Reynolds objected to the recitation, but the trial court overruled the objection based on Evid.R. 803(6), the business records exception to the hearsay rule.

{¶ 7} On August 4 or 5, 2010, Detective Bonnie Weis of the Toledo Police Department ("TPD") was assigned to investigate the rape. Detective Weis testified that she sent victim 1 a letter requesting an interview. Victim 1 scheduled an appointment with Detective Weis for August 17, 2010, but did not appear. Victim 1 said that she did not meet with Detective Weis because she wanted to forget about the rape and did not want to talk about it. Detective Weis claimed that she did not know at the time that a rape kit was collected. Because she did not have assistance from victim 1 or any physical evidence, Detective Weis closed the case.

### B. September 19, 2010 Rape

{¶ 8} H.S. ("victim 2") was raped on September 19, 2010. She testified that her memories of the circumstances surrounding the rape are unclear, but she clearly remembers the rape itself. Victim 2 said that she went to visit her boyfriend at the Lucas County jail around dusk that evening. She was unable to see him, so she decided to take a walk to clear her head. While she was walking, she ran into a man she did not know. She described him as African-American, in his late 20s or early 30s, and about five feet seven inches tall. She said that the man somehow got her between a building and a semi-truck and blocked her path so that she could not leave. The man got behind her, put something hard against her back, and pulled down her pants and underwear. He leaned her over a concrete loading dock and penetrated her vagina with his penis. When the

4.

man finished raping victim 2, he left the scene on a bike, and victim 2 went back to the jail to report the rape.

{¶ 9} Officers took victim 2 to Mercy St. Vincent Medical Center where she underwent a rape examination. Victim 2 described what happened during the examination, including the SANE swabbing her vagina and taking pictures of her injuries.

{¶ 10} Julia Benfield, the SANE who examined victim 2, testified. Benfield collected swabs for forensic testing, which she documented using a rape kit and instructions provided by the state. Benfield documented and took photographs of bruises on victim 2's thigh and cervix; abrasions on her back, labia minora, and posterior forchette; and some swelling and redness on her lower lip. Benfield also swabbed victim 2's vagina, anus, and mouth; took scrapings from under her fingernails; collected head and pubic hair samples; and collected her clothing to include in the rape kit. The state asked Benfield to read victim 2's account of the events that Benfield documented in the rape kit paperwork. Reynolds did not object to the recitation.

{¶ 11} On September 20, 2010, Detective John Rose of the TPD was assigned to investigate the rape. Detective Rose testified that he called victim 2 and left her a message, but she did not respond to his request for an interview. Victim 2 recalled that Detective Rose sent her a letter, but she did not respond because she did not want to talk about the incident any more. Detective Rose said that he learned later that a rape kit was collected, but he did not send it for testing because victim 2 was not cooperating with the

5.

investigation. Although Detective Rose kept the case open for several months, he eventually closed the case because he did not have assistance from victim 2 or any physical evidence.

## C. July 14, 2011 Rape

{¶ 12} In the early morning hours of July 14, 2011, D.W. ("victim 3"), a juvenile, was walking near City Park in Toledo when a man, whom she identified at trial as Reynolds, approached her on a bike. She testified that she saw the man clearly and described him as brown-skinned with a medium build and wearing jean shorts, a white tee shirt, and black tennis shoes. She said that the man tried to talk to her, but she rebuffed him and kept walking. When she walked past him, he grabbed her from behind, put a gun to her hip, and dragged her into an alleyway. He told her to do as he said or he would kill her. The man told victim 3 to lie down under a semi-trailer in the alley. He then put his gun on the ground by the trailer, crawled under the trailer, removed victim 3's shorts and underwear, and penetrated her vagina with his penis. When he finished, he urinated beside the trailer, picked up his gun, took victim 3's cellphone from her, and left the scene on his bike. Victim 3 went to a relative's home nearby and called her mother, who called the police.

{¶ 13} When the police arrived at the relative's home, victim 3 told them what had happened and took the officers to the location where she was raped. The officers found victim 3's cellphone charger under the semi-trailer and noticed a wet spot where the man had urinated.

6.

{¶ 14} The officers then took victim 3 to Mercy St. Vincent Medical Center for a rape examination. Although victim 3 initially refused the exam, she consented after speaking with Sara Ward, the SANE who examined her. Victim 3 described what happened during the examination, including the SANE swabbing her vagina, scraping under her fingernails, collecting samples of her hair, and taking pictures of scrapes on her back.

{¶ 15} Ward explained the procedure in more detail. During the rape exam, Ward collected swabs for forensic testing, which she documented using a rape kit and instructions provided by the state. Ward documented and photographed a scratch on victim 3's left buttock. Ward also swabbed victim 3's vagina, anus, and mouth; took scrapings from under her fingernails; collected head and pubic hair samples; and collected her clothing to include in the rape kit. The state asked Ward to read victim 3's account of the events that Ward documented in the rape kit paperwork. Reynolds did not object to the recitation.

{¶ 16} On July 14, 2011, Detective Shelli Kilburn of the TPD was assigned to investigate the rape. Detective Kilburn testified that she called victim 3's mother and scheduled an interview. Victim 3's mother called Detective Kilburn the morning of the interview and told her that victim 3 had run away from home, so she would not be at the interview. Victim 3 recalled that she spoke to an officer at the hospital, but never followed up with the police because she did not want to have to go to court. Detective Kilburn told victim 3's mother that she could not proceed with investigating the case

7.

without victim 3's cooperation. Detective Kilburn also testified that she knew that a rape kit had been collected, but did not send it for testing because victim 3 was not cooperating with the investigation. Although Detective Kilburn kept the case open, she assigned it to inactive status because she did not have the victim's cooperation.

### D. Rape Kit Testing

{¶ 17} In 2012, the TPD sent all of its untested rape kits to BCI for testing in response to the Ohio attorney general's sexual assault kit initiative. The rape kits from victim 1, victim 2, and victim 3 were among those sent to BCI. Detective Vincent Mauro is a member of the TPD's sexual assault task force, which reviews the test results the department receives from BCI and investigates cases when appropriate. In December of 2014, Detective Mauro identified Reynolds as a possible suspect in the rapes of victim 1, victim 2, and victim 3. He obtained a search warrant for Reynolds's DNA and sent the samples to BCI for testing.

{¶ 18} BCI analyst David Niemeyer testified that he conducted DNA testing on a sample from victim 1's rape kit. The testing found two DNA profiles on victim 1's vaginal swab, one from her and one from an unknown male. Niemeyer compared Reynolds's sample with the unknown male's DNA profile and found that Reynolds's profile is consistent with the unknown male's profile. He claimed that the frequency of occurrence of the unknown male's DNA profile is one in 4 sextillion, 93 quintillion unrelated individuals. Put another way, the probability of randomly selecting an unrelated person with the same DNA profile as the unknown male is one in 4 sextillion,

8.

93 quintillion, a number that is approximately a trillion times more than the population of the earth.

{¶ 19} Niemeyer also conducted DNA testing on a sample from victim 2's rape kit. The testing found two DNA profiles on victim 2's vaginal swab, one from her and one from an unknown male. Niemeyer compared Reynolds's sample with the unknown male's DNA profile and found that Reynolds's profile is consistent with the unknown male's profile. He claimed that the frequency of occurrence of the unknown male's DNA profile is one in 4 sextillion, 93 quintillion unrelated individuals. In other words, the probability of randomly selecting an unrelated person with the same DNA profile as the unknown male is one in 4 sextillion, 93 quintillion, a number that is approximately a trillion times more than the population of the earth.

{¶ 20} BCI analyst Heather Bizub testified that she conducted DNA testing on a sample from victim 3's rape kit. The testing found two DNA profiles on victim 3's vaginal swab, one from her and one from an unknown male. Bizub compared Reynolds's sample with the unknown male's DNA profile and found that Reynolds's profile is consistent with the unknown male's profile. She claimed that the frequency of occurrence of the unknown male's DNA profile is one in 4 septillion, 93 quintillion unrelated individuals. That is, the probability of randomly selecting an unrelated person with the same DNA profile as the unknown male is one in 4 septillion, 93 quintillion, a number that is over a trillion times more than the population of the earth.

9.

{¶ 21} Based on the DNA results, Detective Mauro spoke to the three victims, who all agreed to cooperate with the investigation.

## E. Outcome

{¶ 22} After hearing the evidence, the jury found Reynolds guilty of the three rape counts and the two related gun specifications and not guilty of the aggravated robbery count. The court proceeded directly to sentencing and sentenced Reynolds to 9 years in prison on each rape count and 3 mandatory years in prison on each gun specification. The court ordered Reynolds to serve his sentences consecutively for an aggregate sentence of 33 years.

## F. Request to Withdraw

{¶ 23} Appellant's appointed counsel filed a request to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). In support of his request to withdraw, counsel states that, after reviewing the record of proceedings in the trial court, he was unable to find any appealable issues. Counsel asserted that after thoroughly reviewing the transcript of proceedings from the trial court as well as the applicable case law, no meritorious assignments of error could be presented. Counsel did, however, submit six potential assignments of error:

Assignment of Error One: The trial court erred in refusing to sever counts in the indictment for trial.

Assignment of Error Two: The trial court erred in failing to dismiss the indictment for pre-indictment delay.

10.

Assignment of Error Three: The trial court improperly admitted victim statements to the SANE in violation of Evid.R. 803(4).

Assignment of Error Four: Appellant's convictions are unsupported by sufficient evidence and are against the manifest weight of the evidence.

[Assignment of Error Five:] The trial court erred where it denied Appellant's September 24, 2015 Motion to Dismiss all counts/suppress all evidence/dismiss Count 1 due to the State's failure to preserve evidence.

[Assignment of Error Six:] Appellant was denied the effective assistance of trial counsel where the trial counsel failed to preserve his objections to certain medical records which were read before the jury and failed to renew his Motion to Sever thus preserving the issue for appeal.

{¶ 24} The procedure to be followed by appointed counsel who desires to withdraw for want of a meritorious, appealable issue is set forth in *Anders*. In *Anders*, the Supreme Court of the United States found that if counsel, after a conscientious examination of the case, determines it to be wholly frivolous, he should so advise the court and request permission to withdraw. *Anders* at 744. This request must be accompanied by a brief identifying anything in the record that could arguably support the appeal. *Id.* In addition, counsel must furnish the client with a copy of the brief, request to withdraw, and allow the client sufficient time to raise any matters he chooses. *Id.* Once these requirements have been satisfied, the appellate court must conduct a full examination of the proceedings held below to decide if the appeal is indeed frivolous. *Id.*

11.

If the appellate court determines that the appeal is frivolous, it may grant counsel's request to withdraw and dismiss the appeal without violating constitutional requirements, or it may proceed to a decision on the merits if required by state law. *Id.*

{¶ 25} Here, counsel fulfilled the requirements set forth in *Anders*. Reynolds did not file a pro se brief or otherwise respond to counsel's request to withdraw. We shall proceed with an examination of the potential assignments of error set forth by counsel as well as the entire record below to determine if this appeal lacks merit and is, therefore, wholly frivolous.

## II. Law and Analysis

### A. Motion to Sever

{¶ 26} Counsel's first potential assignment of error alleges that the trial court erred when it did not sever the counts in the indictment for trial. The state contends that Reynolds waived this issue when he failed to renew his pretrial motion to sever at the time of trial, or, if he did not waive the issue, the counts were properly joined. We agree with the state.

{¶ 27} When a defendant makes a pretrial Crim.R. 14 motion to sever, he is required to renew the motion at the close of the state's case or the conclusion of all the evidence so that the trial court can conduct a Crim.R. 14 analysis based on all of the evidence presented at trial. *State v. Rojas*, 6th Dist. Lucas No. L-11-1276, 2013-Ohio-1835, ¶ 34. Failure to renew the motion forfeits all but plain error on appeal. *Id.;* and *see State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 23 (an appellant

12.

forfeits an error by failing to preserve an objection, but forfeiture does not extinguish a claim of plain error under Crim.R. 52(B).)

{¶ 28} We generally review a trial court's decision on a motion to sever for an abuse of discretion. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166. But when the appellant forfeits an issue we review only for plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 62. Here, Reynolds's trial counsel failed to renew his motion to sever after the state presented its case or at the close of the evidence. Thus, he has forfeited all but plain error.

{¶ 29} Plain error is error that affects substantial rights. Crim.R. 52(B). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Plain error is not present unless the outcome of the trial would have been different but for the complained of error. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 78.

{¶ 30} Under Crim.R. 8(A), two or more offenses can be charged in one indictment if the offenses (1) are of the same or similar character, (2) are based on the same act or transaction, (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or (4) are part of a course of criminal conduct.

13.

{¶ 31} Criminal Rule 14 provides, however, that separate trials shall be ordered if it appears that a defendant is prejudiced by joinder of the offenses in one indictment. Because joinder is favored for judicial economy, the defendant bears the burden of claiming prejudice and providing sufficient information for the trial court to weigh the right to a fair trial against the benefits of joinder. *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992); *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. A claim of prejudice depends on whether the advantages of joinder and avoidance of multiple trials are outweighed by the right of a defendant to be tried fairly on each charge. *Torres* at 343.

{¶ 32} The state can use two methods to defeat a defendant's claim of prejudice under Crim.R. 14: the "other acts" test or the "joinder" test. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶ 33} Under the other acts test, the state must show that evidence of the other charged offenses would be admissible as "other acts" under Evid.R. 404(B) even if the counts are severed for trial. *State v. Gibson*, 6th Dist. Lucas Nos. L-13-1222 and L-13-1223, 2015-Ohio-1679, ¶ 28, citing *State v. Townsend*, 6th Dist. Lucas No. L-00-1290, 2002 Ohio App. LEXIS 1633, 21-22 (Apr. 12, 2002). Under the joinder test, the state can defeat a claim of prejudice by showing that the jury is capable of separating the proof of each crime because the evidence of each crime is simple and direct. *Id.* "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant

14.

overlap or conflation of proof." *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 51.

{¶ 34} We find that the trial court's denial of Reynolds's motion to sever does not constitute plain error because the evidence of each crime was separate, direct, and capable of being separated—thereby satisfying the joinder test. The record shows that the state presented its evidence in an orderly fashion and without significant overlap of testimony or conflation of proof. Reynolds does not point to anything that suggests otherwise. We find that the evidence in this case was sufficiently simple and direct to outweigh any prejudice joint trials might have caused Reynolds. Thus, joinder was proper, and the trial court did not commit any error—let alone plain error—when it denied Reynolds's motion to sever. Accordingly, Reynolds's first potential assignment of error is not well-taken.

### B. Motions to Dismiss

{¶ 35} In counsel's second and fifth potential assignments of error, he contends that the trial court erred by failing to grant Reynolds's motions to dismiss. Reynolds claims that the case should have been dismissed for two separate reasons: (1) preindictment delay and (2) failure to preserve evidence. We address each motion in turn.

### 1. Motion to Dismiss for Preindictment Delay

{¶ 36} Reynolds first contends that the trial court should have dismissed his case based on preindictment delay. We disagree.

**{¶ 37}** "[P]reindictment delay violates due process only when it is unjustifiable and causes actual prejudice * * *." *State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, ¶ 12. The test for preindictment delay is a two-step burden-shifting test. First, the defendant must present evidence of actual prejudice. *Id.* at ¶ 13. If he does, the burden shifts to the state to produce evidence of a justifiable reason for the delay; the reason for the state's delay is irrelevant if the defendant cannot establish actual prejudice. *Id.* at ¶ 13, 17. In reviewing the trial court's decision on a motion to dismiss for preindictment delay, we give deference to the trial court's findings of fact, but review the court's application of the law to the facts de novo. *State v. Zimbeck*, 195 Ohio App.3d 729, 2011-Ohio-2171, 961 N.E.2d 1141, ¶ 20 (6th Dist.).

**{¶ 38}** "Actual prejudice exists when missing evidence or unavailable testimony, identified by the defendant and relevant to the defense, would minimize or eliminate the impact of the state's evidence and bolster the defense." *Jones* at ¶ 28, citing *State v. Luck*, 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984). But "[t]he '*possibility* that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice.'" (Emphasis sic.) *Id.* at ¶ 21, quoting *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 105.

**{¶ 39}** In his motion, Reynolds does not identify any relevant evidence that he would have been able to present in his defense but for the state's five-year delay in prosecuting him for the rapes. Rather, his motion states only that "[i]t becomes, after a period of time, difficult to locate witnesses, identify and analyze physical evidence,

determine a person's whereabouts, as well as numerous other factors." This is insufficient to show that he was actually prejudiced by the delay. *Jones* at ¶ 21. Without a showing of actual prejudice, Reynolds was not entitled to have his case dismissed for preindictment delay, and the trial court did not err in denying the motion. Consequently, we find that counsel's second potential assignment of error is not well-taken.

## 2. Motion to Dismiss Based on the State's Failure to Preserve Evidence

{¶ 40} In his fifth potential assignment of error, counsel contends that the trial court erred by denying Reynolds's motion to dismiss based on the state's failure to preserve evidence. In his motion, Reynolds argues that his due process rights were violated when the TPD destroyed the clothes that victim 1 wore at the time of the rape. The clothes were destroyed in March 2013, which was after victim 1's rape kit was sent to BCI for testing, but before Reynolds was identified as a suspect. In its response to Reynolds's motion, the state conceded that the TPD destroyed the clothing, but argued that Reynolds failed to show that the clothes were materially exculpatory and that Reynolds had no evidence that the state destroyed the clothes in bad faith.

{¶ 41} Lost or destroyed evidence in criminal cases is classified into two types: materially exculpatory and potentially useful. Evidence is materially exculpatory if its exculpatory value is apparent on its face and it is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Further, there must be a "reasonable probability" that the result of the proceeding would have been

17.

different if the evidence had been disclosed to the defendant. *State v. Wilson*, 6th Dist. Lucas No. L-08-1380, 2010-Ohio-2247, ¶ 39, citing *State v. Johnston*, 39 Ohio St.3d 48, 61, 529 N.E.2d 898 (1988). Destruction of materially exculpatory evidence is a per se due process violation. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 74. The defendant bears the burden of showing that the destroyed evidence was materially exculpatory. *Id.*

{¶ 42} On the other hand, evidence is potentially useful if "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). For destruction of potentially useful evidence to rise to the level of a due process violation, the defendant must show bad faith on behalf of the state. *Powell* at ¶ 76. Bad faith generally requires something more than bad judgment or negligence; it requires dishonesty, conscious wrongdoing, ulterior motive, or ill will. *Id.* at ¶ 81.

{¶ 43} The record does not support Reynolds's contention that the destroyed clothing was materially exculpatory. The clothing was not exculpatory on its face and Reynolds points to no evidence showing that the outcome of his trial would have been different if he had been given access to the clothes. And, as the state points out in its response to Reynolds's motion, DNA consistent with Reynolds's DNA was found in or around victim 1's vagina; finding another person's DNA profile on victim 1's clothes would not change that fact. All that can be said of the clothes is that they could have

18.

been subjected to further testing, the results of which might have exonerated Reynolds. Thus, we find that the destroyed clothing was only potentially useful evidence.

{¶ 44} Because the clothing was potentially useful evidence, Reynolds is required to show that the TPD acted in bad faith by destroying it. He does not do so. Reynolds's motion to dismiss does not allege any wrongdoing (aside from the destruction of the clothes) or attribute any dishonesty, ulterior motive, or ill will to the TPD. Without such evidence, Reynolds cannot meet his burden of showing that his due process rights were violated. We find, therefore, that counsel's fifth potential assignment of error is not well-taken.

### C. Admission of Victims' Hearsay Statements

{¶ 45} In his third potential assignment of error, counsel contends that the trial court improperly admitted the victims' statements to the SANEs. He argues that the statements are inadmissible hearsay and are not admissible under Evid.R. 803(4) because they are not statements for the purposes of medical diagnosis or treatment. The state counters that Reynolds did not object to any of the statements as hearsay and, further, the statements were properly admitted under Evid.R. 803(6), the business records hearsay exception.

{¶ 46} Our review of the transcript shows that Reynolds did not object to the SANEs' reading of victim 2's or victim 3's transcribed statement from their medical records, or object to the statements of any victim being admitted as part of the medical records. Because Reynolds failed to preserve those errors, he forfeited them, and we

19.

review only for plain error. Reynolds did, however, object to O'Neal's testimony regarding victim 1's statement.

### 1. Victim 1's Statement

{¶ 47} While O'Neal was testifying, the prosecutor asked her to read the statement by victim 1 that O'Neal documented in victim 1's rape kit. Reynolds's attorney objected. At sidebar, the prosecutor argued that the statement was admissible under Evid.R. 803(4) as a statement for the purpose of medical diagnosis or treatment. The court admitted the statement as business records under Evid.R. 804(6). Reynolds now contends that the trial court erred by admitting the statement.

{¶ 48} "On appeal, challenged hearsay is subject to de novo review under the applicable hearsay rule, rather than the more deferential review employed for discretionary rulings" because "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29, 32 (6th Dist.), citing *State v. Sutorius*, 122 Ohio App.3d 1, 7, 701 N.E.2d 1 (1st Dist.1997); and *State v. Sorrels*, 71 Ohio App.3d 162, 165, 593 N.E.2d 313 (1st Dist.1991).

{¶ 49} The challenged testimony is hearsay within hearsay. That is, the medical records and victim 1's statement in the medical records are both hearsay—i.e., out of court statements offered to prove the truth of the matter asserted—making both the records and victim 1's statement presumptively inadmissible. Evid.R. 801(C), 802.

20.

Evidence Rule 805 provides that hearsay within hearsay is admissible "if each part of the combined statements conforms with an exception to the hearsay rule * * *."

{¶ 50} We first consider whether the medical records are admissible under a hearsay exception. The Ohio Supreme Court has identified the requirements to establish admissibility of records under Evid.R. 803(6), the business record exception to the hearsay rule:

"To qualify for admission under Rule 803(6), a business record must manifest four essential elements: (i) the record must be one regularly recorded in a regularly conducted activity; (ii) it must have been entered by a person with knowledge of the act, event or condition; (iii) it must have been recorded at or near the time of the transaction; and (iv) a foundation must be laid by the 'custodian' of the record or by some 'other qualified witness.'" Weissenberger, Ohio Evidence Treatise (2007) 600, Section 803.73. Even after these elements are established, however, a business record may be excluded from evidence if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Evid.R. 803(6). *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 170.

{¶ 51} Victim 1's medical records meet the requirements for admissibility under Evid.R. 803(6). First, O'Neal testified that the medical records were regularly kept in the course of the hospital's business. She also testified that when she performs a rape

examination, she regularly transcribes the patient's statement into her medical record. O'Neal testified that she was the person who examined victim 1, heard her statement, and transcribed the statement at the time it was made. Additionally, the state established the proper foundation for the records before they were admitted (without objection from the defense). Finally, there is no evidence that "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Evid.R. 803(6). Accordingly, we find that the medical records are admissible business records.

{¶ 52} We find, however, that the majority of victim 1's statement within the medical records is inadmissible hearsay because it fails to satisfy Evid.R. 803(4), which exempts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* For such statements to be admissible under this exception, the declarant's motive must be consistent with that of a patient seeking treatment and it must be reasonable for the medical provider to rely on the information in diagnosing and treating the declarant. *State v. Ridley*, 6th Dist. Lucas No. L-10-1314, 2013-Ohio-1268, ¶ 49, citing *State v. Clary*, 73 Ohio App.3d 42, 52, 596 N.E.2d 554 (10th Dist.1991). We have previously found that a description of the injuring event and identification of the perpetrator fall within the medical diagnosis or treatment hearsay exception. *Id.* at ¶ 52, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15.

22.

**{¶ 53}** The only part of victim 1's statement that is admissible under Evid.R. 803(4) is the sentence where she briefly described her rape, i.e., the injuring event. The rest of the statement describes what led up to the assault and victim 1's actions after the assault. Nothing else in the statement constitutes information that is "reasonably pertinent to diagnosis or treatment," describes the actual event that caused victim 1's injuries, or identified the perpetrator. Therefore, the majority of the statement does not fit within the medical diagnosis and treatment exception and should have been excluded from evidence.

**{¶ 54}** Nevertheless, any error caused by the admission of victim 1's statement was harmless. Harmless error is "Any error, defect, irregularity, or variance which does not affect substantial rights * * *." Crim.R. 52(A). Error is harmless if "there is no reasonable possibility that the evidence may have contributed to the accused's conviction." *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph seven of the syllabus. In considering the issue of harmless error appellate courts are to "assess the impact" of the inadmissible testimony on the jury. *State v. Rahman*, 23 Ohio St.3d 146, 151, fn. 4, 492 N.E.2d 401 (1986). Improper admission of hearsay is harmless when the declarant is examined on the same matters that are contained in the impermissible hearsay and the admission of the hearsay is essentially cumulative. *State v. Noles*, 6th Dist. Lucas No. L-12-1310, 2013-Ohio-4088, ¶ 42, quoting *State v. Tomlinson*, 33 Ohio App.3d 278, 281, 515 N.E.2d 963 (12th Dist.1986).

23.

{¶ 55} Here, the impact of O'Neal reading victim 1's statement from her medical records was negligible because the statement's admission was cumulative of other admissible testimony. Moreover, victim 1 testified to the facts in her statement during the trial and was subject to cross-examination. Reynolds was also able to cross examine O'Neal regarding her recording and recitation of victim 1's statements. Thus, we conclude that the court admitting victim 1's statement was harmless error.

### 2. Victim 2's and Victim 3's Statements

{¶ 56} Counsel also contends that the trial court erred by allowing the two other SANEs, Benfield and Ward, to read victim 2's and victim 3's statements from their medical records. Trial counsel did not object to either statement, however, so Reynolds has forfeited all but plain error regarding the admission of the statements. *Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, at ¶ 62.

{¶ 57} Again, the challenged testimony is hearsay within hearsay, and the medical records fall within the business records exception of Evid.R. 803(6). The statements by victim 2 and victim 3, however, are similar to victim 1's statement in that they both contain some information that falls under the Evid.R. 803(4) hearsay exception because they are statements for the purpose of medical diagnosis or treatment, but the majority of the victims' statements is inadmissible hearsay. Also like victim 1's statement, we find that the admission of the other victims' statements was harmless because both victims testified and were cross examined, as were both of the SANEs who recorded the statements, and the admission of the statements was cumulative to other admissible

24.

testimony.  Accordingly, we cannot find that the outcome of the trial would have been different but for the admission of victim 2's and victim 3's statements.  Therefore, no plain error exists.

{¶ 58} Accordingly, counsel's third potential assignment of error is not well-taken.

### D.  Sufficiency and Manifest Weight of the Evidence

{¶ 59} In the fourth potential assignment of error, counsel contends that Reynolds's convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  The state argues that all of Reynolds's conviction are supported by sufficient evidence and are not against the manifest weight of the evidence.

### 1.  Sufficiency of the Evidence

{¶ 60} Reynolds first contends that his convictions are not supported by sufficient evidence.  We disagree.

{¶ 61} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  (Internal citations omitted.)  *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).  In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses.  *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132.  Whether there is sufficient evidence to support a conviction is a question of law.  *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

25.

{¶ 62} Reynolds was convicted of three counts of rape under R.C. 2907.02(A)(2), two of which included gun specifications under R.C. 2941.145. The rape statute requires the state to prove that the defendant engaged in sexual conduct with another by compelling the other person to submit by force or threat of force. R.C. 2907.02(A)(2). "Force" for purposes of a rape conviction is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661, paragraph one of the syllabus.

{¶ 63} Conviction of a gun specification under R.C. 2941.145 requires the state to prove that the defendant had a firearm on or about his person or under his control while committing the charged offense and that he displayed, brandished, or indicated that he possessed the firearm, or used the firearm to facilitate the offense.

{¶ 64} At trial, each victim testified that an unknown man engaged in penetrative sex with her against her will, which he accomplished by placing an object he said was a gun against her body and threatening to shoot or otherwise injure her if she did not comply with his demands. Victim 3 saw the gun that the man was carrying. And victim 2 testified that the man physically pushed her against the edge of a loading dock before raping her. Further, victim 3 identified Reynolds as her assailant, and two BCI scientists testified that the DNA found in or around each victim's vagina was consistent with

26.

Reynolds's DNA and that the chance of randomly finding the same DNA profile in a group of unrelated individuals was one in a number roughly a trillion times greater than the earth's population. This evidence is sufficient to support the jury's findings that Reynolds committed all three rapes. It is also sufficient to show that Reynolds indicated that he possessed a gun at the time of the rapes of victim 1 and victim 3 or used the gun to facilitate the rapes of victim 1 and victim 3.

{¶ 65} We conclude that a rational trier of fact could have found all of the essential elements of rape and the gun specifications proven beyond a reasonable doubt. Thus, Reynolds's convictions are supported by sufficient evidence.

## 2. Manifest Weight of the Evidence

{¶ 66} Reynolds also contends that his convictions are against the manifest weight of the evidence. When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 386, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the

27.

conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172*,* 175, 485 N.E.2d 717 (1st Dist.1983). Although under a manifest weight standard we consider the credibility of witnesses, we extend special deference to the jury's credibility determinations given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 67} After reviewing the evidence and the credibility of the witnesses, we are not convinced that the evidence weighs heavily against Reynolds's convictions. Nor can we say that the jury lost its way or created a manifest miscarriage of justice by convicting Reynolds of the three rape counts and two gun specifications. We find, therefore, that Reynolds's convictions are not against the manifest weight of the evidence. Accordingly, counsel's fourth potential assignment of error is not well-taken.

### E. Ineffective Assistance of Counsel

{¶ 68} In the final potential assignment of error, appellate counsel asserts that Reynolds received ineffective assistance of trial counsel because trial counsel failed to preserve certain issues for appellate review by failing to renew Reynolds's motion to sever and failing to object to the nurses reading victim 2's and victim 3's statements from their medical records.

{¶ 69} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the

28.

adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 70} To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 71} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695. Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel. *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22.

{¶ 72} In evaluating an ineffective assistance of counsel claim, the critical inquiry is the effect of counsel's errors on the trial. *State v. Halsell*, 9th Dist. Summit No. 24464, 2009-Ohio-4166, ¶ 34. "Failure to preserve error on appeal—even if professionally

29.

unreasonable—is not tantamount to ineffective assistance of counsel when there is no effect on the judgment below." *Id.* Furthermore, "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988). Rather, the appellant must first show that there was a substantial violation of defense counsel's essential duties to his client and, second, that he was materially prejudiced by counsel's ineffectiveness. *State v. Shaw*, 6th Dist. Lucas No. L-15-1165, 2016-Ohio-7699, ¶ 19, citing *Holloway* at 244.

{¶ 73} Here, there is no evidence in the record that counsel's failure to renew the motion to sever fell below an objective standard of reasonable representation. As we discussed above, given that the evidence of each charge was simple and direct, the trial court did not err in refusing to sever the counts of the indictment. Thus, Reynolds cannot show that he was materially prejudiced by counsel's failure to renew the motion. Accordingly, we find that counsel's failure to renew the motion to sever was not ineffective assistance.

{¶ 74} Likewise, there is no evidence in the record that counsel's failure to object to the admission of the victims' statements was a violation of their essential duties to Reynolds or fell below an objective standard of reasonable representation. And, as we discussed above, any error in allowing the nurses to read the inadmissible portions of the statements to the jury was harmless, preventing Reynolds from showing that he was materially prejudiced by counsel's failure to object. We find, therefore, that the record does not demonstrate that Reynolds's trial counsel were ineffective by failing to object to

30.

the hearsay statements.  Therefore, counsel's sixth potential assignment of error is not well-taken.

## III.  Conclusion

{¶ 75} This court has thoroughly reviewed the record of proceedings in the trial court, including the trial testimony and exhibits.  We find that the trial court did not err by refusing to sever the counts in the indictment for trial, admitting evidence from the victims' medical records, or denying Reynolds's motions to dismiss; Reynolds's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence; and Reynolds's trial counsel provided effective representation.  Appointed counsel's potential assignments of error are without merit.

{¶ 76} Upon our own independent review of the record, we find no grounds for a meritorious appeal.  Accordingly, this appeal is found to be without merit and is wholly frivolous.  Appellant's counsel's motion to withdraw is found well-taken and is hereby granted.

{¶ 77} The April 11, 2016 judgment of the Lucas County Court of Common Pleas is affirmed.  Reynolds is ordered to pay the costs of this appeal pursuant to App.R. 24.

{¶ 78} The clerk is ordered to serve all parties with notice of this decision.

Judgment affirmed.

31.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.

James D. Jensen, J.

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE