[Cite as *State v. Laser*, 2020-Ohio-5216.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WILLIAMS COUNTY

State of Ohio                                                    Court of Appeals Nos. WM-19-006
                                                                                                    WM-19-007
       Appellee                                                     WM-19-008

v.                                                                       Trial Court Nos. 18CR000185
                                                                                                     18CR000261
Scott D. Laser                                                                            19CR000037

       Appellant

                                                                         **DECISION AND JUDGMENT**

                                                                         Decided:  November 6, 2020

* * * * *

Katherine J. Zartman, Williams County Prosecuting Attorney,
for appellee.

Clayton M. Gerbitz, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} In this consolidated appeal, appellant, Scott Laser, appeals the judgments of

the Williams County Court of Common Pleas, following a jury trial, convicting him of

two misdemeanors and nine felonies.  For the reasons that follow, we affirm.

{¶ 2} On appeal, appellant asserts the following assignments of error:

Assignment of Error I. The trial court erred in admitting multiple hearsay statements in violation of Evid.R. 802.

Assignment of Error II. The trial court erred when it allowed evidence of prior bad acts to be admitted in violation of Evid.R. 404(B).

Assignment of Error III. Appellant received ineffective assistance of counsel.

{¶ 3} This appeal involves three separate cases against appellant. In case No. 18CR000185, appellant was indicted on one count of theft in violation of R.C. 2913.02(A)(2), a felony of the fifth degree. In case No. 18CR000261, the Williams County Grand Jury returned an eight-count indictment charging appellant with two counts of aggravated menacing in violation of R.C. 2903.21(A), misdemeanors of the first degree; one count of importuning in violation of R.C. 2907.07(B)(1), a felony of the fifth degree;[1] one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a), a felony of the fifth degree; one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a felony of the fourth degree; one count of obstructing justice in violation of R.C. 2921.32(A)(1) and (C)(3), a felony of the fifth degree; one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; and one count of corrupting another with drugs in violation of R.C.

---

[1] The count of importuning was dismissed before trial.

2925.02(A)(4)(a) and (C)(1), a felony of the second degree. Finally, in case No. 19CR000037, the Williams County Grand Jury returned a four-count indictment charging appellant with one count of receiving stolen property in violation of R.C. 2913.51(A) and (C), a felony of the fifth degree; and three counts of receiving stolen property in violation of R.C. 2913.51(A) and (C), felonies of the fourth degree.

{¶ 4} On February 21, 2019, upon the consent of the parties, the court consolidated the cases for purposes of trial. A jury trial was held over the course of five days beginning on April 23, 2019. The trial revealed the following pertinent information, which we will present as it pertains to each case.

### Case No. 18CR000261

{¶ 5} Montpelier Police Patrolman Jason Sprague testified that on November 23, 2018, he received a report of a runaway juvenile, B.G., who was believed to be in the company of appellant at his residence. Appellant was over 40 years old at the time. Sprague responded to appellant's residence at approximately 12:46 p.m. that day, and knocked on the door and announced his presence. Sprague testified that although appellant's truck was in the driveway, no one answered. Sprague then left the scene. Sprague returned at 2:15 p.m. and 5:17 p.m., and again there was no response. Sprague testified that he subsequently learned that appellant called the police later that day and reported that B.G. was at his house.

{¶ 6} B.G. testified that on Thanksgiving Day, November 22, 2018, appellant contacted her multiple times over the phone using the messenger account of his son, T.L.

3.

Appellant introduced himself as T.L.'s father, and said that his name was Scooter. Appellant asked her if she wanted to run away. At first, B.G. rebuffed appellant, but later that night, after further pressure, B.G. agreed to go along with appellant and T.L. to Ohio. B.G., who was 14 years old at the time, explained that she thought she was in love with T.L. and wanted to be with him, but her parents would not allow it. B.G. told a couple of friends that she was running away, and that night snuck out of her house with a couple of bags and her dog.

{¶ 7} As she was walking towards where she was to meet appellant, B.G. changed her mind and told appellant over the phone that she did not want to run away. However, B.G. had already sent appellant her location. Shortly thereafter, a car approached and someone came up to her and stated, "[T]his is Officer Scooter, you're under arrest." B.G. turned around and saw a person she later identified as appellant. B.G. testified that she "kind of" thought it was a joke, "but not really." Appellant then grabbed B.G. by the arm and put her in the back seat of the pickup truck. B.G. testified that in addition to appellant, T.L. and another individual named T.W. were also in the truck.

{¶ 8} B.G. testified that as they were riding in the truck, appellant was making sexual comments towards her such as "you're one of [T.L.'s] hottest girlfriend, we're going to keep you here, you're one of the good ones." B.G. then felt a bottle up against her leg, and she asked T.L. what it was. T.L. responded that it was "Triple C," a type of cold medicine, and when B.G. repeated that name, appellant ordered her to drink some of it. B.G. testified that appellant kept giving her and T.L. bottles of Triple C and ordering

4.

them to drink. B.G. stated that she did not feel like she could refuse. B.G. estimated that she drank about one and a half bottles of Triple C.

{¶ 9} Thereafter, B.G. began to go in and out of consciousness. Eventually, B.G. woke up on a bed in appellant's house in her t-shirt and underwear. According to B.G., appellant was in the bed with her, and T.L. was on the floor of the room. T.L. and B.G. then got up to go to the bathroom, and appellant then went back to his own bedroom. B.G. testified that she was stumbling and could barely walk. When she came back out of the bathroom, appellant ordered her into his bedroom where he kept trying to touch her vagina over the outside of her clothes. B.G. told him no repeatedly and smacked his hand away, until finally T.L. pushed appellant away.

{¶ 10} B.G. then left the room, and went back to T.L.'s room. After she left, she heard appellant and T.L. argue, and then T.L. came back to his room and he had a bloody nose and a black eye. T.L. explained that he injured himself trying to do a flip on his dad's bed. B.G. and T.L. then went back into appellant's room, where she observed appellant smoking a glass pipe that had a white crystal in it. Appellant told B.G. numerous times to smoke the pipe, and finally B.G. complied. B.G. also testified that she observed appellant do another type of drug, referred to as "hot rails," but this time B.G. steadfastly refused.

{¶ 11} After this, appellant, B.G., and T.L. played a game of hide and seek. During the game, B.G. did not try to leave the house. B.G. testified that she wanted to

5.

leave, but felt like she could not leave because appellant repeatedly said that he wanted to keep her there.

{¶ 12} B.G. testified that at one point, appellant gave her a bandana and said that she was part of his gang, and that they were going to go rob the dollar store. B.G. thought that was "kind of funny," and said "no, that's not going to happen."

{¶ 13} Later, B.G. and T.L. went back to appellant's room where he made them each take three or four pills from a white bottle. B.G. was unsure what the pills were. B.G. then went downstairs to get T.L. a glass of water. She testified that she tried walking out the front door at that time, but stopped because she saw T.W. asleep on the couch near the door. She then went upstairs with the water, and then went into T.L.'s room where appellant told them that she and T.L. were going to have sex and he would watch. B.G. stated that she and T.L. started kissing and T.L began touching her. According to B.G., she and T.L. did not want to engage in that behavior, but ended up doing it because appellant was sitting there in the room.

{¶ 14} B.G. testified that the next thing she remembered was that the police arrived at appellant's residence, and appellant ushered her and T.L. into the attic. After the police left, B.G. came down from the attic. She stated that she must have passed out because the next thing she remembers was appellant putting her back up into the attic again. After the police left a second time, B.G. was in T.L.'s room when she heard her parents' car arrive. B.G. testified that she and T.L. tried to get her parents' attention, but they could not open the window, and B.G.'s parents could not hear them. Finally,

6.

appellant told B.G. that he was tired of all that was going on, and so he was going to call the police and report that B.G. was at his house.

{¶ 15} When Sergeant Jennifer Hern of the Montpelier Police Department arrived at approximately 10:30 p.m. on November 23, 2018, B.G. told her the story that she claims appellant told her to say, which was that B.G. had gotten into a fight with her dad, that her dad hit her, and that she wanted to get away. B.G. also told Sergeant Hern that one of her friends named Tyler drove her to appellant's house without appellant's foreknowledge. At trial, B.G. testified that the story she told Sergeant Hern was not true. The state then played a video recording from Hern's body camera of her interaction with appellant, T.L, and B.G., that ended with B.G. leaving with Hern.

{¶ 16} B.G.'s mother, L.G., described that when she picked up her daughter from the police station, her daughter appeared drunk and delusional. According to L.G., B.G. did not know what day it was, even though she had only been gone for approximately 24 hours. B.G.'s parents then took her to a hospital in Michigan near where they lived. B.G. asserted that while at the hospital, she told Michigan police the true story of what had happened to her. Mark Vandervest of the Michigan State Police testified that he performed a drug screen on a urine sample provided by B.G., and the screen came back positive for amphetamine, methamphetamine, and dextromethorphan. Vandervest explained that dextromethorphan is a drug that is commonly found in cold medicines such as Robitussin, and when taken in very large doses it can produce hallucinogenic effects.

7.

{¶ 17} Michigan State Trooper Erik Gantert testified that he interviewed B.G. at the hospital. Based on her behavior and physical appearance, Gantert immediately suspected that B.G. was under the influence of some type of controlled substance, which he believed to be methamphetamine. Gantert testified that during the interview, B.G. stated that she hoped that she had not done any drugs, but that appellant and T.L. had given her a couple bottles of Triple C cough syrup. B.G. also described to Gantert that appellant and T.L. did drugs called "hot rails" in front of her, and that they also smoked white crystals in a glass pipe. The interview ended when B.G. began to cry hard, blood started coming out of her nose, and she vomited in a trash can.

{¶ 18} On cross-examination, appellant challenged B.G. on some inconsistencies between her testimony and her written statements to the Michigan police. For instance, B.G. told the officers that T.L. told her to get into the truck, not appellant, and that T.W., not appellant gave her the "Triple C" to drink in the truck. B.G. also told the officers that she did not remember using drugs while at appellant's house, and she did not tell the officers that she played hide and seek with appellant. B.G. explained that with time her memories had come back to her, and that things were clearer now that she was not on drugs.

{¶ 19} Following these events, a search warrant was executed at appellant's residence on December 7, 2018. Patrolman Sprague testified that during the execution of the search warrant they found appellant's son, T.L., hiding in the attic. T.L. was 17 years old at the time. Sprague recounted that the search also found a magazine for a .22 caliber

8.

weapon, two-way radios, a couple of empty blister packs for cold and cough medicines, an empty pill box of prescription pseudoephedrine in appellant's name, a knife sheath, a couple of firearm holsters, and several black bandanas. In the dining room and kitchen, the police found more cold and cough medicine blister packs, a pink picture book with pictures of B.G., and several empty brown bottles of Delsym cold and cough syrup. In the basement, they found a red Toro snow blower that the Williams County Sheriff's Office notified them to be on the lookout for because it was possibly connected to a theft. The basement also contained a trash bag with more open bottles of Delsym cold and cough syrup, and several shell casings from a .10 millimeter gun and some from a .22 caliber gun. Sprague testified that he observed a support pillar that had several holes in it, some with slugs still in them, indicating that someone was firing the guns in the basement. The last area Sprague searched was appellant's truck. There, Sprague found red and blue lights arranged on the dash as a police vehicle would have them. Sprague also found a "tudor," which he described as a cut-down straw that is used to snort drugs like heroin.

{¶ 20} Sprague then authenticated photographs taken during the search. As he was describing the photographs, Sprague testified regarding a separate search that he had conducted in the house around May 16, 2018, in which he found four bottles of children's nighttime cold and cough syrup on appellant's desk. Appellant did not have any children residing with him at the time.

9.

{¶ 21} Sprague next testified regarding an interview that he had with T.W. T.W. allegedly was present in appellant's house while B.G. was there. T.W. told Sprague that appellant and T.L. went to Michigan to pick up B.G., and T.W. claimed that he did not have anything to do with any of the events that occurred at appellant's residence. T.W. did inform him, however, that appellant used the cold and cough medicine all the time for the purpose of getting high, and that the medicine had a street name of Triple C. According to Sprague, T.W. also observed appellant using meth. On cross-examination, Sprague acknowledged that T.W. was in fact present when appellant and T.L. went to Michigan to pick up B.G. Sprague also agreed that T.W. stated that he did not observe any sexual interaction or drug use between appellant and B.G.

{¶ 22} Sergeant Hern also testified regarding the search warrant that was executed on December 7, 2018. Hern stated that she was the person who documented all the items that were found, which included a loaded .38 caliber revolver found in a bedroom and a high point rifle. Hern also testified that a substance determined to be crystal meth was found during the search. The Bureau of Criminal Investigation report identifying the substance as 2.11 grams of crystal methamphetamine, as well as a notarized affidavit of the forensic scientist that authored the report were later admitted as evidence.

{¶ 23} Further, Hern testified to messages that were taken from a phone that was recovered at the residence during the execution of the search warrant. The messages referred to appellant's participation in a "mafia" known as "DK-Mob," and included several pictures of appellant holding what appeared to be real guns. However, Hern

10.

acknowledged on cross-examination that she was not aware of any gang activity, and did not have knowledge one way or the other whether the "DK-Mob" was simply a joke amongst friends.

{¶ 24} Patrolman Morgan Hughes of the Montpelier Police Department also testified regarding the search. Hughes authenticated numerous photographs that were taken during the search. Hughes also read the contents of an unsigned, typed letter found in appellant's room, which offered protection to residents for a fee of $200 per month. The letter threatened that if the fee was not paid, or if the resident contacted the police, then the author's gang would harm or kill the resident and his or her family.

{¶ 25} The state next called Montpelier Police Lieutenant Darrell Higbie. Higbie interviewed T.L. during the execution of the December 7, 2018 search warrant. As part of his testimony, Higbie read a statement written by T.L., in which T.L. claimed that he stole a gun and a hat for appellant because he did not want to be hit by appellant. T.L. also explained that he and appellant picked B.G. up on the side of the road, and that T.W. and appellant were having B.G. drink cough syrup. T.L. stated that appellant told him and B.G. to go up into the attic where they could wait for B.G.'s dad to pick her up.

{¶ 26} T.L. testified at trial that he has done drugs with appellant on multiple occasions, including meth and the cough syrup. T.L. testified that on the night he picked up B.G., he does not recall appellant identifying himself as "Officer Scooter" or telling B.G. that she was under arrest. T.L. stated that when B.G. got into the truck, she took out some marijuana and they began smoking it. T.L. also relayed that he, appellant, and B.G.

11.

were also drinking cough syrup, and that nobody forced B.G. to drink the cough syrup. T.L. testified that B.G. used meth at appellant's house, but that she asked appellant for it, and because appellant was "messed up" he let her. When the police came to the house the first time, T.L. and B.G. went up into the attic, but he explained that no one forced him to go up there.

{¶ 27} Another witness called by the state was K.M., who at the time of trial was fifteen years old. K.M. testified that sometime in August or October of 2017, she and her friend C.H. were visiting appellant's daughter at his house. She testified that more than once on different dates, appellant would chase C.H. around the house making gestures with his fingers and yelling "cooter time," indicating to K.M. that appellant wanted to stick his fingers in C.H.'s vagina.

{¶ 28} K.M. also testified regarding an incident where appellant was drunk and wanted K.M. to drive and get more ingredients for the tacos that were being made for dinner. When K.M. refused—because she was not old enough to have a driver's license—appellant pushed her up against the wall, pulled a knife out of his pocket, and held the knife against her throat. Appellant then pulled back and started laughing, saying that he was surprised that K.M. did not move. K.M. then recounted another incident on that day where appellant pulled a gun down off of a shelf and started moving it around the room, pointing it at her, C.H., and others. At another time, appellant tried to get K.M. to hold a gun. He tried to make her part of his gang, and said that she should steal a black bandana from Walmart and wear it all the time, and keep a gun tucked in her pants. K.M.

12.

testified that appellant threatened her that if she ever told her parents about what happened at his house, that he would come to her house and kill everyone. Finally, K.M. testified that during the times that she was at appellant's house, appellant offered her alcohol two or three times, and also offered her cough syrup.

{¶ 29} The state next called B.H., who is C.H.'s older sister. B.H. testified that appellant played "cooter time" with her and her sister, and that appellant tried to touch her vagina. B.H. also testified that appellant gave her and C.H. alcohol. Finally, she testified that appellant gave her and C.H. bandanas, and tried to have them be part of his gang.

{¶ 30} R.L., T.L.'s older sister, also testified. R.L. testified, over appellant's objection, that six or seven years earlier she lived with appellant. During that time, appellant would behave in sexually inappropriate ways towards her friends, including dancing with them and touching their butts. In addition, one of R.L.'s teenage friends would spend the night in appellant's bedroom. R.L. also testified that she would use "Triple C" with appellant, and that she observed appellant using meth. Following R.L.'s testimony, the trial court instructed the jury that they just heard evidence of appellant's commission of other acts other than the offenses for which he was on trial. The court instructed the jury that the other acts evidence was not to be considered to show that he acted in conformity with that character, but may be considered only for the purposes of showing an absence of mistake, to prove motive, to prove opportunity, intent, purpose, preparation, or plan, or finally to prove his identity.

13.

{¶ 31} Regarding the high point rifle that was found in appellant's residence, and T.L.'s admission of stealing a gun, Defiance County Sheriff's Deputy Andrew Seiple testified about a report of a theft from the Wooden Indian Pawn Shop on November 28, 2018. The item reported stolen was a high point rifle. Video footage of the theft showed T.L. enter the store and remove an item from the rifle rack and place it in his sweatshirt. T.L. then walks to the front of the store where he meets appellant, and then the two leave the store in appellant's truck. Charlotte Williams, the pawn shop owner, testified and confirmed that the high point rifle that was recovered from appellant's residence during the December 7, 2018 search had the same serial number as the high point rifle that was stolen from the pawn shop.

{¶ 32} Seiple testified that he interviewed T.L. and appellant after they were arrested during the December 7, 2018 search. Seiple stated that T.L. confessed to stealing the rifle. First he said that he did it to impress appellant, but later said that appellant forced him to steal the rifle. According to Seiple, T.L. told him that appellant thanked him for stealing the rifle, and appellant told him not to tell anyone. During Seiple's interview with appellant, appellant stated that he did not know that T.L. had stolen the rifle, and only found out when he was cleaning his house. During his testimony, T.L. admitted to stealing the high point rifle from the pawn shop, but testified that it was his idea to steal the rifle. He stated that he lied to the police when he told them that appellant told him to steal the rifle.

14.

{¶ 33} Williams County Deputy Sheriff Brandon Willis testified that he received a complaint on December 3, 2018, from Larry Casebere regarding someone breaking and entering into his home. Several things were reported missing from Casebere's residence, including a generator, a snow blower, an extendable ladder, and a .38 caliber revolver. Casebere reported appellant as a suspect because approximately a year earlier appellant was hired to install a bay window in Casebere's kitchen and was paid $500, but never returned to do the work. Willis also testified that on September 26, 2018, Casebere reported a theft from his residence of several firearms.

{¶ 34} Willis testified that the December 7, 2018 search of appellant's residence recovered the snow blower and .38 caliber revolver, as well as a receipt to the Wooden Indian Pawn Shop for a generator and a ladder. When Willis went to the pawn shop, he discovered that appellant had also pawned two of the guns that had been stolen from Casebere in September.

{¶ 35} Williams County Sheriff's Deputy Ken Jacob testified that he interviewed T.L. on December 7, 2018. T.L. informed him that approximately a week earlier, appellant had awoken him at 3:00 a.m. to help unload an aluminum ladder, a generator, and a snow blower from appellant's truck. T.L. also observed appellant with a .38 caliber revolver on his hip at the time. Later that day, T.L. accompanied appellant to the pawn shop where appellant pawned the ladder and generator.

{¶ 36} During T.L.'s testimony, T.L. testified that he went with his dad to steal the items from Casebere's house, and that he lied to Deputy Jacob when he told him that his dad woke him up in the middle of the night to unload things from the truck. T.L. explained that he lied because he did not want to get into trouble.

{¶ 37} The state next called Charlotte Williams, the owner of the Wooden Indian Pawn and Gun Shop. Williams verified that appellant sold the guns that had belonged to Casebere, and had pawned Casebere's aluminum ladder and generator.

{¶ 38} Sanford Steiler also testified for the state. Steiler testified that while Casebere was in the hospital recovering from an injury, he would go over to Casebere's house nearly every day to take care of the cat. Steiler was the one who noticed that the house had been broken into and that property was missing. Casebere testified and identified the items that were stolen from his home, including the snow blower, generator, ladder, .38 revolver, two additional guns, as well as several other items.

## Case No. 18CR000185

{¶ 39} West Unity Police Lieutenant Philip Fry testified that he investigated a complaint from Bonnie Spencer regarding the theft of $2,000 by appellant. Fry testified that Spencer reported that she hired appellant to do a roofing job, and that she paid him $2,000 up front, but he never performed the job. Patrolman Kyle Potts testified that he contacted appellant to speak about the matter, but appellant did not want to speak without a lawyer present, and further claimed that he returned the $2,000 to Spencer.

16.

{¶ 40} Bonnie Spencer testified that on June 16, 2018, she entered into a written agreement with appellant to have him perform work on her roof. In exchange, Spencer agreed to pay appellant $2,000 up front for materials, another $1,000 after he began the work, and a final $1,050 upon completion. Appellant never ordered the materials for the roof. When Spencer followed up on appellant's non-performance, she expressed her concern that the roof was leaking. Appellant then came to the residence and nailed some plastic bags over the leaking area. According to Spencer, appellant never performed any work on the roof, and never returned the $2,000.

## Jury Verdict

{¶ 41} Following the presentation of the evidence, the jury returned with a verdict of guilty as to all counts, with the exception of the count of abduction on which the jury could not reach a verdict and a mistrial was declared. Thereafter, at the sentencing hearing, the trial court ordered appellant to serve a total prison term of 12 and one-half years.

## Hearsay

{¶ 42} In his first assignment of error, appellant argues that the trial court erred in admitting multiple hearsay statements. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Because appellant did not object to the hearsay statements at trial, we are limited to plain error review. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 72. "Under Crim.R. 52(B), '[p]lain errors or

17.

defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'" *Id.* at ¶ 62. "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." *Id.* "We take '[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

{¶ 43} In support of his assignment of error, appellant does not make a particularized argument as to any specific incident of hearsay, but instead generally argues that there were multiple instances of hearsay statements attributed to B.G., Bonnie Spencer, Larry Casebere, and T.L., and "[i]t is hard to know whether the jury relied on a witness' in-court sworn testimony or two or three other versions of it presented by law enforcement testimony and written or recorded statements."

{¶ 44} From his statement of facts, appellant identifies the following instances of hearsay:

1. Patrolman Jason Sprague's testimony regarding his interview with T.W.

2. Lieutenant Darrell Higbie's testimony regarding his interview with T.L. about the circumstances of B.G.'s presence at appellant's residence.

3. Patrolman Morgan Hughes' testimony regarding the protection letter found in appellant's room.

4. Trooper Erik Gantert's testimony regarding his interview with B.G.

5. Lieutenant Phillip Fry's testimony regarding what was reported to him by Bonnie Spencer.

6. Deputy Brandon Willis's testimony regarding the reports of break-ins and the items stolen from Larry Casebere.

7. Deputy Andrew Seiple's testimony regarding his interview with T.L. concerning the theft of the high point rifle.

8. Deputy Ken Jacob's testimony regarding his interview with T.L. concerning the property stolen from Larry Casebere.

Addressing these various instances of hearsay, we find that in no case does the admission of the statements rise to the level of plain error.

{¶ 45} As to the hearsay statements of the declarants Bonnie Spencer and Larry Casebere, both of those declarants testified at trial and their testimony was consistent with the hearsay statements. Thus, the admission of the hearsay statements offered no new matter and was merely cumulative. "Admission of hearsay statements under such circumstances has been recognized as constituting harmless error." *State v. Duszynski*, 6th Dist. Lucas No. L-10-1063, 2010-Ohio-6511, ¶ 52; *State v. Tomlinson*, 33 Ohio App.3d 278, 281-282, 515 N.E.2d 963 (12th Dist.1986). Therefore, we hold that the admission of those statements does not constitute plain error.

19.

{¶ 46} As to the hearsay statements of B.G. and T.L., while both of the declarants testified at trial, their testimony was not entirely consistent with their out-of-court statements. However, the witnesses were subject to cross-examination, and were questioned on the inconsistencies in their statements. Thus, the jury was well-positioned to execute its function to make a credibility determination by seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. As such, we conclude that appellant has failed to show that the admission of those hearsay statements affected his substantial rights and rose to the level of plain error.

{¶ 47} Turning to the hearsay statements of T.W., we recognize that T.W. did not testify at trial. Nevertheless, we find the statements attributed to T.W. to be harmless beyond a reasonable doubt. The only statements potentially prejudicial to appellant were T.W.'s alleged statement that appellant used Triple C and meth to get high, and that T.W. had nothing to do with the circumstances of B.G. being at appellant's residence; T.W.'s other statement that he never observed any sexual activity between appellant and B.G. was beneficial to appellant. Regarding T.W.'s statement about appellant's drug use, we find that the record is replete with other evidence proving the same, including B.G.'s testimony, T.L.'s testimony, and the physical evidence of crystal methamphetamine and large quantities of empty cold medicine bottles found at appellant's residence. Regarding T.W.'s statement that he had nothing to do with B.G.'s presence at the house, we find

20.

that this statement contradicts B.G.'s statement to the Michigan State Police that T.W. gave her Triple C while in the truck. However, T.W.'s statement is only relevant on the count of corrupting another with drugs, and there is ample other evidence in the record to support that charge, including, again, B.G.'s testimony, T.L.'s testimony, B.G.'s positive test for methamphetamines, and the physical evidence of drug use recovered from appellant's residence. Thus, we find that appellant has failed to demonstrate that the admission of T.W.'s statement affected his substantial rights and rose to the level of plain error.

{¶ 48} Finally, turning to Patrolman Morgan Hughes' testimony concerning the protection letter found in appellant's room, we note that this instance of hearsay is different from the others in that the declarant is unknown. To the extent that appellant is the author of the letter, then the letter is not hearsay under Evid.R. 801(D)(2), which provides that "[a] statement is not hearsay if: * * * The statement is offered against a party and is (a) the party's own statement, in either an individual or a representative capacity." To the extent that appellant is not the author of the letter, but rather a recipient, then there is no prejudicial impact as it would not show a propensity to commit bad acts. Thus, any admission of that letter is harmless.

{¶ 49} Therefore, we hold that appellant has failed to demonstrate that the admission of any of the hearsay testimony affected his substantial rights. This is not the exceptional circumstance in which we must recognize plain error to prevent a manifest miscarriage of justice.

21.

**{¶ 50}** Accordingly, appellant's first assignment of error is not well-taken.

### Other Acts Evidence

**{¶ 51}** In his second assignment of error, appellant argues that the trial court erred when it allowed multiple instances of testimony concerning appellant's prior bad acts. Evid.R. 404(B) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶ 52}** In his brief, appellant lists 15 separate instances of purported prior bad acts testimony:

1. T.W.'s hearsay testimony through Patrolman Jason Sprague that appellant used Triple C and meth to get high;

2. T.L.'s testimony that he has used Triple C and meth on several occasions with appellant;

3. R.L.'s testimony that she used Triple C with appellant and observed him using meth;

4. T.W.'s hearsay testimony through Patrolman Jason Sprague that previously "there was another child [at appellant's residence] that [T.W.] said he thought may have had something going on between [appellant] and this child;"

5. B.G.'s testimony that appellant was trying to touch her vagina;

22.

6. B.G.'s testimony that appellant tried to take off her shirt;

7. K.M.'s testimony that appellant chased C.H. around the house yelling "cooter time," and that appellant told her that liked her more like a dating partner;

8. B.H.'s testimony that appellant played "cooter time" with her sister, and that appellant tried to touch her vagina;

9. R.L.'s testimony that appellant acted in sexually inappropriate ways with her friends, and that one of her friends spent the night in appellant's bedroom;

10. B.G.'s testimony that appellant told her that she was part of his gang and that they were going to rob the dollar store;

11. Sergeant Jennifer Hern's testimony regarding a theft at Miller's New Market on November 26, 2018, committed by appellant and T.L.;

12. The testimony of Larry Casebere and Deputy Brandon Willis that Casebere paid appellant $500 to install a bay window, and appellant took the money but never did the work;

13. The protection letter read by Patrolman Morgan Hughes;

14. K.M.'s testimony that appellant offered her alcohol and cough syrup;

15. B.H.'s testimony that appellant gave her and C.H. alcohol;

{¶ 53} In support of his assignment of error, appellant first claims—without pointing to any part of the record—that the state did not provide notice of its intent to use other acts evidence as required by Evid.R. 404(B), which states, "In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Appellant cursorily asserts that due to the sheer volume of the other acts evidence, the failure to provide pretrial disclosure substantially impaired his rights to due process of law. Aside from this assertion, appellant makes no legal argument in support. In response, the state asserts—without pointing to any part of the record—that it did provide notice of this evidence in discovery, and that it was discussed with defense counsel in detail. Notably, the record does not contain an entry of notice of intention to use other acts evidence under Evid.R. 404(B). However, there is no indication from the trial transcript that defense counsel was surprised or unprepared for the other acts evidence. To the contrary, counsel appeared well-informed on cross-examination, and even knew to object to R.L.'s testimony as evidence of prior bad acts before she took the stand. Because we ultimately hold that the outcome of the proceedings was not affected by the introduction of the evidence, we do not reach the issue of whether the state failed to provide notice under Evid.R. 404(B).

{¶ 54} Secondly, appellant summarily asserts that the other acts evidence was offered to show conduct in conformity therewith, and was not offered for a legitimate

24.

purpose under Evid.R. 404(B). As with his hearsay arguments, appellant does not engage in any analysis of a particular instance of other acts evidence. He then concludes—with no further argument—that "[a]n examination of all of the relevant evidence that was properly admitted at trial, leads to the conclusion that the absence of other acts evidence cited above would certainly have changed the outcome of this case."

{¶ 55} In response, the state argues that the evidence establishes appellant's modus operandi "in attempting to intimidate, abduct, and victimize B.G. by the use of police impersonation, drugs, Triple C, gang affiliation, weapons, threats, and sexual conduct." Further, the state argues that the evidence establishes appellant's "motive, opportunity, intent, preparation, plan, and knowledge in the commission of his crimes relating to B.G. and K.M." The state focuses on the fact that much of this evidence was relied upon in closing argument in the context of demonstrating appellant's guilt on the charge of abduction. Because the jury did not return a guilty verdict, and the trial court declared a mistrial on that charge, the state argues that the evidence could not have been unduly prejudicial.

{¶ 56} At the outset, we note that "[t]he admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law," which we review de novo. *State v. Hartman*, Slip Opinion No. 2020-Ohio-4440, ¶ 22. However, at trial, appellant only objected to R.L.'s testimony. Thus, for the remainder of the instances of purported other acts evidence, appellant has waived all but plain error. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 80.

{¶ 57} While we are concerned about the admissibility of much of this testimony in light of the Ohio Supreme Court's recent guidance in *Hartman*, we decline to reach the issue of whether any of the evidence was inadmissible under Evid.R. 404(B) because we find that even if it was error to admit the testimony, the error was harmless in light of the fact that much of the evidence pertained to the charge of abduction, for which appellant was not convicted, and there was overwhelming evidence of appellant's guilt on the remainder of the charges.[2]

{¶ 58} In case No. 18CR000261, appellant was charged and convicted of six crimes.

{¶ 59} The first two are counts of aggravated menacing in violation of R.C. 2903.21(A), which provides, "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." These counts were supported by the testimony of K.M. that appellant held a knife up to her throat and threatened to kill her family.

{¶ 60} The third count is aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(a), which provides, "No person shall knowingly obtain, possess,

_____

[2] We further believe that our decision to not analyze the specific instances of other acts evidence is particularly prudent where appellant himself has not engaged in such an analysis. "An appellate court is not a performing bear, required to dance to each and every tune played on an appeal." *Dudley v. Dudley*, 12th Dist. Butler No. CA2019-01-021, 2019-Ohio-4309, ¶ 10, quoting *State v. Wilson*, 12th Dist. Warren No. CA2018-03-022, 2019-Ohio-338, ¶ 27.

26.

or use a controlled substance or a controlled substance analog." This count was supported by the crystal methamphetamine and drug paraphernalia found in appellant's home during the December 7, 2018 search.

{¶ 61} The fourth count is receiving stolen property in violation of R.C. 2913.51(A) and (C), which provides, "No person shall receive, retain, or dispose of property of another knowing of having reasonable cause to believe that the property has been obtained through commission of a theft offense." This count was supported by the presence of the high point rifle in appellant's residence, the testimony of Charlotte Williams that the serial number matched the serial number of a rifle taken from her pawn shop, the video evidence of T.L. stealing the rifle while appellant was present, and T.L.'s testimony to that effect.

{¶ 62} The fifth count is obstructing justice in violation of R.C. 2921.32(A)(1) and (C)(3), which provides, in relevant part, "[N]o person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime * * * shall do any of the following: (1) Harbor or conceal the other person or child." This count was supported by the testimony that when the police arrived on December 7, 2018, to execute the search warrant, appellant's son, T.L. hid in the attic because he was delinquent for having a weapon under a disability, and appellant concealed T.L.'s presence in the residence.

{¶ 63} The sixth count is corrupting another with drugs in violation of R.C. 2925.02(A)(4)(a) and (C)(1), which provides, "No person shall do any of the following:

27.

* * * (4) By any means, do any of the following:  (a) Furnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard."  This count was supported by the evidence that appellant, an approximately 40-year-old man, gave crystal methamphetamine and Triple C to B.G., a 14-year-old girl, as testified to by B.G. and T.L., and further supported by B.G.'s positive test for methamphetamine and dextromethorphan.

{¶ 64} In case No. 19CR000037, appellant was charged and convicted of four counts of receiving stolen property in violation of R.C. 2913.51(A) and (C), which provides, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."  Of those four counts, one was for the miscellaneous property including the ladder, generator, and snow blower.  The other three counts were for the .38 caliber revolver recovered during the December 7, 2018 search, and the two other firearms that appellant sold to the pawn shop.  These counts were supported by the testimony of Larry Casebere as to the stolen items, T.L.'s testimony that he assisted appellant in either stealing the items or unloading them from his truck in the middle of the night, the presence of the snow blower in appellant's house, the pawn shop receipts, and Charlotte Williams' testimony that appellant was the individual that sold or pawned the items.

28.

{¶ 65} Finally, in case No. 18CR000185, appellant was charged and convicted of one count of theft in violation of R.C. 2913.02(A)(2), which provides, "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:  * * *  (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent."  This count was supported by Bonnie Spencer's testimony and documentary evidence that appellant agreed to do a roof repair for her, was paid $2,000 for supplies, but never ordered the supplies or attempted to complete the repair.

{¶ 66} Therefore, in light of the overwhelming evidence of appellant's guilt on the charges for which he was convicted, we hold that the admission of R.L.'s testimony, if error, was harmless beyond a reasonable doubt.  *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). Furthermore, we hold that the admission of the remaining other acts evidence, if error, did not rise to the level of plain error.

{¶ 67} Accordingly, appellant's second assignment of error is not well-taken.

### Ineffective Assistance of Counsel

{¶ 68} In appellant's third, and final, assignment of error, appellant argues that he was deprived of the effective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  That is, appellant must demonstrate that counsel's performance fell below an objective standard

29.

of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

{¶ 69} In this case, appellant first asserts that trial counsel was ineffective for failing to move to separate the trial on the three indictments. Appellant, however, makes no attempt to demonstrate whether a motion to separate the trials would have been successful, arguing only that it was prejudicial to appellant for the jury to hear evidence of appellant's other bad acts.

{¶ 70} Initially, we note that the trial court ordered the indictments to be tried together based upon the consent of the parties, and appellant, in his brief, does not allege or point to anything in the record supporting the contention that the decision to join the cases was without his consent. The record does reveal, however, that during a pretrial hearing on appellant's motion for new counsel, appellant expressed his view that "having all these cases all on the same thing in front of the jury trial too would just, might be prejudice against me because you're looking at all the other stuff too instead of the main focus, you know what I'm saying?" The court responded that

> [t]he law in Ohio is because of the simplicity of these charges and the fact
>
> that they occurred on or about the same time, they can be tried together.
>
> * * * There are exceptions to that rule but I've already ordered them to be

consolidated.  I guess if you want to discuss with [trial counsel] the possibility of separating those, he can file the appropriate motion and I will consider it.  But we consolidated all three (3) cases because at the time, it was by consent of both sides.

A motion to separate the trials was never filed, and appellant never raised the issue again. Thus, the logical inference is that appellant decided not to pursue the motion to separate trials, and trial counsel was not ineffective for failing to do so.

{¶ 71} Even assuming that appellant wanted counsel to file a motion to separate the trial, and counsel refused, appellant has not made the requisite showing that a reasonable probability exists that the motion would have been granted.  Crim.R. 13 provides, "The court may order two or more indictments or informations or both to be tried together, if the offenses or the defendants could have been joined in a single indictment or information."  Pursuant to Crim.R. 8(A),

Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

If, however, "it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial

together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.

> A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

*State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. One of the methods a prosecutor can use to negate such a claim of prejudice is the "joinder" test, which provides that "when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

{¶ 72} Here, as noted by the trial court, the evidence pertaining to the separate indictments was simple and direct. For case No. 18CR000185, the evidence was separate and distinct from the testimony concerning B.G.'s presence at appellant's residence on November 23, 2018, and the subsequent search of appellant's residence on December 7, 2018. Indeed, the evidence consisted of the testimony of Bonnie Spencer and Lieutenant Philip Fry solely regarding the $2,000 paid for a roof repair project. "Ohio appellate

32.

courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, ¶ 33, quoting *State v. Robinson*, 6th Dist. Lucas No. L-09-1001, 2010-Ohio-4713, ¶ 51.

**{¶ 73}** Likewise, the evidence presented for case No. 19CR000037, while overlapping some with case No. 18CR000261, was still simple and direct. The evidence overlapped because some of the property stolen from Larry Casebere was recovered from appellant's residence during the December 7, 2018 execution of the search warrant. Furthermore, T.L. and the owner of the pawn shop, Charlotte Williams, testified regarding both cases. But the evidence was clearly presented to the jury, with a straightforward distinction between the high point rifle that was stolen from the pawn shop as charged in case No. 18CR000261, and the three firearms and miscellaneous other property that was stolen from Larry Casebere as charged in 19CR000037.

**{¶ 74}** Therefore, we hold that appellant has not demonstrated a reasonable probability exists that the trial court would have granted the motion to sever the trials had counsel filed such a motion. Consequently, appellant's claim of ineffective assistance of counsel on this basis is without merit.

**{¶ 75}** Alternatively, appellant argues that trial counsel was ineffective for failing to object to the numerous instances of hearsay and other acts evidence, and also for failing to object to any of the offered exhibits on the basis of hearsay, relevance, foundation or authentication, or prior bad acts. In addition, appellant asserts that trial

33.

counsel failed to object to the state's use of lay witnesses to provide expert testimony in the form of officers' observations of the impact of narcotics on the user.

{¶ 76} Beginning with counsel's failure to object to the hearsay and other acts evidence, as we discussed above, the trial court's admission of that evidence was harmless and did not affect appellant's substantial rights as it pertains to the crimes for which he was convicted. Thus, appellant has failed to demonstrate a reasonable probability that the results of the proceedings would have been different had counsel objected.

{¶ 77} Turning to counsel's failure to object to the exhibits and to the lay witness testimony, we find that as with appellant's first and second assignments of error, appellant's brief serially lists 31 different exhibits that should have been objected to, but does not provide any detailed argument supporting the exhibits' inadmissibility. Similarly, appellant's entire argument concerning the failure to object to expert testimony from lay witnesses consists of: "Trial counsel also failed to challenge multiple instances of Appellee's use of lay witnesses who provided expert testimony." Thus, we hold that appellant has failed to satisfy his burden to demonstrate that the results of the proceedings would have been different in that the exhibits or testimony would have been excluded had counsel objected. Therefore, we find no merit to appellant's claim of ineffective assistance of counsel on these grounds.

{¶ 78} Accordingly, appellant's third assignment of error is not well-taken.

**{¶ 79}** Having found that the trial court did not commit prejudicial error to appellant and that substantial justice has been done, the judgments of the Williams County Court of Common Pleas are affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                                JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, J.                     _____
CONCUR.                                                         JUDGE

                                          _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.