[Cite as *State v. Rybak*, 2020-Ohio-5367.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

        Appellee

v.

Brian Rybak

        Appellant

Court of Appeals No. L-19-1064

Trial Court No. CR0201802730

**DECISION AND JUDGMENT**

Decided:  November 20, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SINGER, J.**

{¶ 1} Following a jury trial, defendant-appellant, Brian Rybak, appeals the

February 21, 2019 judgment of the Lucas County Court of Common Pleas, convicting

him of domestic violence and intimidation, and sentencing him to a total prison term of 72 months.  For the following reasons, we affirm, in part, and reverse, in part, the trial court judgment.

## I.  Background

{¶ 2} On September 19, 2018, Rybak was indicted on one count of domestic violence, a violation of R.C. 2919.25(A) and (D)(4), a third-degree felony; intimidation, a violation of R.C. 2921.03(A) and (B), a third-degree felony; disrupting public services, a violation of R.C. 2909.04(A)(1) and (C), a fourth-degree felony; and endangering children, a violation of R.C. 2919.22(A), (E)(1), and (E)(2), a fourth-degree misdemeanor.

{¶ 3} The matter proceeded to a jury trial on February 11, 2019.  Before trial, the state and the defense stipulated that Rybak had two previous domestic-violence convictions:  (1) April 13, 2016, in Lucas County case No. CR-15-2255, and (2) October 16, 2008, in Toledo Municipal Court case No. CR-08-201960101.  At trial, the following evidence was presented.

## A.  The 9-1-1 Call

{¶ 4} On December 16, 2017, at 7:47 a.m., an unidentified male called 9-1-1 to report that his upstairs neighbor, Brian Ryback, had been beating a woman for the last four days.  The man reported that Ryback had fled in a red and silver pick-up truck.

2.

## B. The Responding Officer, Gregory Smith

{¶ 5} Toledo Police Officers Gregory Smith and Angela Domschot were dispatched to the scene. On their way, Officer Smith observed a red and silver pick-up truck coming from the direction they were headed. He turned the cruiser around and got behind the vehicle. There was another vehicle directly behind the truck—a tan or silver Chevy Silverado—that the officer had to pass before initiating a stop of the red and silver truck.

{¶ 6} Officer Smith believed that he would find Rybak in the red and silver truck, but upon approaching the vehicle, he encountered Rybak's wife, A.R., and their approximately six- or seven-year-old son. The child had a blanket wrapped around him, was not wearing shoes or socks, and was crying. A.R. was visibly upset—she was shaking and crying, and her right eye was black. She told Officer Smith that she was trying to get to the safety building and that her husband was in the vehicle that was following her. She said that Rybak hit her in the lip the day before and grabbed her out of bed that morning, but had not hit her that day. She explained that Rybak believed she was cheating on him and had taken her phone from her. Officer Smith contacted a detective and took A.R. and her son to the safety building.

{¶ 7} After A.R. met with the detective, Officer Smith took A.R. home to get some of her things. He made sure that Rybak was not there. He does not know where A.R. went after that. Officer Smith testified on cross-examination that he did not notice anything about how the red and silver pickup truck was driving, and did not notice

3.

anything unusual about the tires. He did not recall A.R. saying anything about Rybak trying to let the air out of her tires.

## C. The Victim, A.R.

{¶ 8} A.R. is married to Rybak. They have two children together—a ten-year-old and an eight-year-old. Their relationship is rocky. They would live together, he would kick her out, she would go to her dad's, then they would work things out. In January of 2017, A.R. moved back in with Rybak, who was living with his father on the second floor of a duplex on Kelsey Avenue. His father was dying of cancer, and she helped care for him. He died on January 31, 2017. Rybak's sister died later the same year.

{¶ 9} By the end of the year, things were not going well between Rybak and A.R. He started accusing her of cheating on him—an accusation she denies. To the contrary, A.R. maintained that she had no friends and no one to turn to because Rybak had scared people away. A.R. claimed she could not even get a job because employers saw Rybak as a liability; he would come to work and threaten people.

{¶ 10} Rybak worked at KCS Contracting from 7:00 a.m. to 5:00 p.m. He started coming home when he was supposed to be at work because he believed A.R. had people at the house. He would search the house. He even placed recording devices around the house, sometimes hiding them in stuffed animals.

{¶ 11} On December 13, 2017, Rybak came home during the day, screaming at A.R. and accusing her of having people there. He searched the house. She denied that anyone had been there, but he did not believe her. He attacked her, chased her, and

4.

grabbed her. She tried to get away. At one point, Rybak picked up their ten-year-old son and used him as a shield so A.R. could not defend herself. A.R. tried to calm Rybak down. She told their sons to go in their room and play. She retreated to her bedroom, but Rybak followed, and they continued to argue. He then put on his headphones and listened to the recordings from the various devices he kept throughout the house; A.R. went to bed. She did not call 9-1-1 that night because Rybak had taken her phone.

{¶ 12} On December 14, 2017, Rybak got up and went to work; he returned A.R.'s phone to her. He came home from work because A.R. failed to answer the phone when he called—she said that she tried to answer it, but was doing laundry and did not get to the phone in time. She did not call him back because she wanted time to breathe. Rybak came home, grabbed the phone, and broke it. He told her "now he can't call you." A.R. denied that she was on the phone or texting with anyone.

{¶ 13} After breaking A.R.'s phone, Rybak began accusing her of using the children's tablets. He punched a hole in the cable modem and threw it off the back balcony, again saying "now you can't talk to him." A.R. again denied that she had been talking to anyone.

{¶ 14} Around 2:00 a.m., A.R. was in the bathtub. Rybak turned off the circuit breaker, then broke down the bathroom door because he said he heard her talking on the phone. He tried to grab the phone from her—which she said did not work anyway—and punched her in the eye, giving her a black eye.

5.

{¶ 15} On December 15, 2017, Rybak woke up and went to work. He came home at lunch and began fighting with her, again insisting that people were in the house. The children were at school, and she was home alone without a working phone.

{¶ 16} Later that afternoon, their older son stayed at a friend's house and their younger son came home. Because Rybak left work earlier, he had not gotten his paycheck, so the three of them drove across town to get it. The ride was stressful. At one point, A.R. asked if they could stop for cigarettes and a pop—Rybak told her to get some from her boyfriend. They returned home after picking up his check.

{¶ 17} On the morning of December 16, 2017, Rybak woke A.R. by dragging her out of bed by her ankles. He accused her of having sex with a homeless man in their basement. She followed him into the computer room and asked for a cigarette. He pressed his forearm against her neck and told her to tell him who these people are. When he let her go, she ran to put on her socks and shoes and told him that she was going to the police. She grabbed the keys and went out to the truck—a red and gray Dodge Dakota. Rybak followed her and told her not to go. He stood in front of the truck and started letting air out of the front driver-side tire. She could hear it. She put the truck in park and went back inside, and he followed.

{¶ 18} Rybak sat on the couch and again listened to the recordings from the devices. Their younger son was also on the couch. A.R. went out the door to the truck and started driving toward the safety building. Rybak followed her and she saw that their son was not with him. She circled back to the duplex to get him. He was on the porch in

6.

his pajamas with a blanket over his head. She put him in the truck and drove off. Rybak followed her again. Shortly thereafter, the police pulled her over and she explained that she had been trying to get away.

{¶ 19} The police took A.R. to the safety building and she met with Detective Deborah Hahn. A.R. was scared and did not want to get Rybak in trouble. She felt bad that he had lost his dad and his sister and she did not want him to go back to jail, so she was not immediately truthful with Detective Hahn. When she met with the detective, A.R. had a black eye and bruises on her face, neck, and arms.

{¶ 20} After A.R. left the safety building, she was escorted back to the house by other officers. They checked the house, and no one was there, so they left. Rybak ran up the steps about two minutes later and asked "Really?" He then ran back downstairs and she did not see him again until court in October of 2018. She communicated with him via email and he called her occasionally. She thinks he was in Florida.

{¶ 21} In email communications, Rybak used the name "David Close." He wrote her an email apologizing for what he had done, which A.R. read aloud to the jury. She said she cried when she read the email because it was what she wanted to hear. She wanted her husband back because she still loves him, but she is filing for divorce.

{¶ 22} A.R. testified that there is a long history of domestic violence with Rybak. She cannot count how many times she has called the police in ten years, but estimated more than ten times. A.R. testified that she has a hole in her head from Rybak assaulting her in 2015. She has no teeth because he slammed her face into a countertop to break her

7.

teeth so no one else would want her. In 2015, he also broke her ankle by hitting it with a pipe; her ankle never healed properly. A.R. suffers from post-traumatic stress disorder.

{¶ 23} A.R. conceded that she has assaulted Rybak, but she claimed that she has never caused injury to him that required medical care. She explained that she has only assaulted him when she could not take it anymore and fought back. A.R. denied that during the incident giving rise to these charges, Rybak merely grabbed her to prevent her from assaulting him.

{¶ 24} A.R. also admitted that she originally told Detective Hahn that there had been a tussle over the phone; only after an hour did she tell Detective Hahn that Rybak hit her. She said she initially told Detective Hahn that the black eye was an accident because she wanted to help Rybak. She acknowledged that some of her teeth were removed because of dental problems.

{¶ 25} A.R. agreed that she has called police numerous times to report domestic violence by Rybak, and when she has, he has gone to jail. He has been convicted twice, including for injuries he caused her in 2015. Rybak has never gone to trial before for harm he has caused her; he entered pleas of guilty.

{¶ 26} A.R. denied that she was free to leave her home, even though she sometimes had the keys to the red and gray truck. She said that Rybak had recording devices in the truck and would track her every move and show up wherever she was.

8.

## D. Detective Deborah Hahn

{¶ 27} Detective Hahn was assigned to A.R.'s case and met with A.R. at the safety building. She observed that A.R. was upset and shaking and had visible injuries in different stages of healing, including a black eye. There were red marks around her neck area, but no finger marks. A.R. appeared worn out and gaunt—Detective Hahn guessed her weight at 85 pounds. A.R.'s son was in pajamas with no coat, shoes, or socks. He appeared shy and scared.

{¶ 28} Detective Hahn explained that victims of domestic abuse often have affection toward their abusers and do not want them prosecuted or taken away from them. It is typical of domestic-violence victims not be truthful. It was not surprising to Detective Hahn that A.R. stayed in the house and did not take off with the kids, even when she had the opportunity to do so. Domestic-violence victims believe the person is going to change and that things will get better.

{¶ 29} After speaking with A.R., Detective Hahn filed charges. She tried to locate Rybak, but was unsuccessful. According to the charges she filed, Rybak choked A.R. numerous times causing broken blood vessels in both eyes. Detective Hahn acknowledged that broken blood vessels were not visible in all of the pictures from that day and the ones where they were visible did not depict them as clearly as they appeared in person.

9.

{¶ 30} Detective Hahn learned that officers had been called to the home the day before. They made no arrests and took no photos at that time. She spoke to the officers but did not write a report about their conversation.

{¶ 31} Detective Hahn also did not talk to the 9-1-1 caller. The caller said Rybak was hitting A.R. and had hit her the day before. To her knowledge, the 9-1-1 caller had no reason to fabricate the allegations. His comment that Rybak was "beating the hell out of her" was corroborated by what A.R. told her. When A.R. said Rybak had not hit her that day, this was in reference to her eye injury. But that morning, he had dragged her out of bed, choked her up against the wall, chased her, then followed her when she fled.

{¶ 32} Detective Hahn agreed that crying causes red eyes, and A.R. was crying and upset when they met. She also agreed that drug use, lack of sleep, and unhealthy eating can cause someone to be gaunt and underweight. She did not know for sure why A.R. appeared unhealthy.

### E. Rybak

{¶ 33} Rybak described that the period of December 13, 2017, to December 16, 2017, was "rough." A.R. video-chatted with him that Monday, but hung up when he asked where she was. He could see that she was in the truck. A.R. later claimed that her phone died.

{¶ 34} On December 15, 2017, around 8:30 p.m., they put their younger child to bed. Rybak and A.R. then went to bed and watched a movie. He fell asleep, but awoke at 3:00 a.m. to find that she was gone. He looked all over the house for her, but she was not

10.

there. The next morning, he woke up around 7:00 a.m. and she was there, but she was wearing different clothes than what she had worn to bed. He asked her what she had been doing and if she had fun. She did not respond.

{¶ 35} Afterwards, Rybak sat in the dining room with his coffee and shouted nasty things at A.R. After about ten to 12 minutes, she jumped out of bed and charged at him and punched him in the face several times. He tried to block the hits. She was crying, screaming, and calling him names. This went on for ten minutes. She grabbed the keys off the hook and smashed them into his head before running out the door to the truck. He asked where she was going and told her to just tell him if something was going on.

{¶ 36} In the meantime, their son woke up. He ran outside behind them, wearing no shoes or coat. Rybak asked A.R. where she was going, but she did not say. She grabbed their son and took off in the truck. Rybak followed A.R. because she was in no state to be driving with his son dressed like that. He denied that he stood in front of the truck or that he let air out of the tires.

{¶ 37} Rybak said that A.R. had a second cell phone and while following her, he called her on it. He asked where she was going, and requested that she turn around and get some clothes for their son. She was hysterical and he could barely make out what she was saying. Rybak saw a police car do a u-turn and told A.R. that he was getting pulled over, but the officer pulled A.R. over instead. He and A.R. remained on the phone until the officer approached A.R.'s window. Rybak turned down Sixth Street. He did not stay

11.

there because A.R. was upset about the things he said to her, and when the police get involved, he ends up going to jail until the case gets resolved.

{¶ 38} Rybak has been arrested for domestic violence of A.R. seven or eight times. He has been convicted twice. He did not go to trial in those two cases because he accepted his guilt. He said that he knows he should never lay a hand on a woman. The last time he was convicted he got a one-year sentence. He was released November 19, 2016.

{¶ 39} After A.R. was stopped by the police, Rybak went to Menards to buy a new lock for a door. He tried to call A.R. but the call was forwarded into voice mail. He went to the house and installed the lock. He got a hotel in Northwood. A.R. called him around 5:00 p.m. The next day he drove to Florida. He was there from December 17, 2017, to July 21, 2018. He admits that he wrote the email A.R. read in court; he was accepting responsibility for their problems, but did not admit that he laid hands on her. He was apologizing for being verbally abusive and felt bad even after the things A.R. did to him. He wanted to clear the slate. He denied that he was trying to get her to drop the charges against him. He also said that he was under the influence of drugs when he wrote the email.

{¶ 40} Rybak claimed that he left the area because his head was not in the right place to sit in jail. His younger sister had died two months earlier, he had sadness in his life and stress in his relationship, and he was seeing a psychiatrist.

12.

{¶ 41} With respect to the December 14, 2017 bath tub incident described by A.R., he claimed that he heard water running, but he could also hear A.R. whispering loudly over the water. He opened the locked door to find A.R. in the tub fully clothed with her feet up, letting the water go down the drain; she was on the phone. He tried to grab the phone, and she struggled for it. She then threw it at the back of his spine. He picked it up and snapped it in half.

{¶ 42} With respect to A.R.'s teeth, he claims that her teeth were removed because of cavities at the gum line, around the top of her teeth. The dentist recommended removing all the teeth and replacing them with a full upper plate. A.R. usually sleeps with the plate in, but was not wearing it in court; he said it was weird to see her there without it.

{¶ 43} Rybak denied dragging A.R. out of bed by her ankles or putting his forearm across her neck. He claimed that he did not restrain her from leaving. The only physical combat by him was to prevent her from hitting him. He said that he vowed when he went to prison the last time that he would not hit her again and she has thanked him for not doing that anymore, even when she has her fits. He described their relationship as toxic and said that he told her he wanted a divorce and asked her to write down whatever she wanted in the divorce. She still loved him and didn't want a divorce.

{¶ 44} Rybak believes that the 9-1-1 caller had a biased opinion of what had happened. The caller indicated that Rybak beats A.R. every day and it had been going on for four days. Rybak thinks the 9-1-1 caller was mistaken and was biased because he

13.

knew from A.R. that Rybak was out on parole. He said that on December 16, 2017, A.R. hit him two or three times. She was "running at him crazy every day"—stomping and arguing back and forth. He believes the neighbor could have misconstrued what was happening. Rybak claimed that he bled from A.R. hitting him with the keys and insisted that he had photos of the injury but had not shown them because he does not intend to press charges. Although he agreed that he would be the victim if A.R. struck him with the keys and made him bleed, he still assumed that he would have gone to jail.

{¶ 45} Rybak never saw A.R. with another man in this timeframe, but he heard her speak with another man and believes that A.R. was cheating on him. He said that A.R. had a second phone that was not on his account, and he did not have access to the messages on that phone. Rybak claimed that one guy A.R. talked to called him and told him to tell A.R. to stop driving by his house.

{¶ 46} Rybak believes that A.R. is lying and making this incident up because she is a "scorned woman." He fled to Florida for eight months, mainly to get away from her. He told her that he wanted a divorce but she kept insisting that they not break up. He also said she was angry with him because he would not buy her drugs. He agreed that most of the time he was arrested for domestic violence, it was dismissed because A.R. did not show up or because she showed up and tried to keep him out of trouble.

{¶ 47} Rybak claimed that A.R. looked the way she did in the photos taken at the safety building because she would go two or three days without sleeping and was taking

14.

her son's Adderall. He also said that she came home with a black eye and he asked her where it was from and she said it was nothing.

## F. The Verdict

{¶ 48} The jury found Rybak guilty of domestic violence and intimidation, and not guilty of endangering children. The state dismissed the disrupting-public-services charge. The trial court imposed a 36-month prison term on each conviction, to be served consecutively for a total prison term of 72 months.

{¶ 49} Rybak appealed. He assigns the following three errors for our review:

I.

Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

II.

The trial court erred in denying Appellant's Crim.R. 29 motion.

III.

The jury's verdict was against the manifest weight of the evidence presented at trial.

## II. Law and Analysis

### A. Ineffective Assistance of Counsel

{¶ 50} In his first assignment of error, Rybak argues that his trial counsel rendered ineffective assistance by opening the door for the state to inquire about his prior bad

behavior toward the victim. Specifically, trial counsel asked A.R. on cross-examination whether she had ever assaulted Rybak. The state asked to approach the bench. It objected to the question and indicated that if Rybak questioned A.R. about incidents where she assaulted Rybak, it would then be permitted to inquire about prior assaultive behavior by Rybak.

{¶ 51} Trial counsel told the court that questions about assaultive behavior by A.R. would be relevant to show that Rybak may have had to restrain her, causing marks on her body. The trial court forewarned counsel that the line of questioning would open a "Pandora's box." Counsel indicated that he understood. Rybak argues here that counsel's trial strategy benefited the state, allowing it to cast him in a more negative light than would otherwise have been possible.

{¶ 52} The state argues that generally, counsel's trial tactic cannot form the basis for a claim of ineffective assistance of counsel. It maintains that defense counsel's questions about A.R.'s assaultive behavior challenged A.R.'s credibility and provided an explanation for the marks that were observed on her body. And while this line of inquiry may have permitted evidence of past abuse by Rybak, it also provided further opportunity to challenge A.R.'s credibility—for instance, A.R. testified on direct that Rybak knocked out her teeth, but on cross-examination, she conceded that some of her teeth were removed for unrelated medical reasons. The state claims that Rybak also sought to make the point that whenever he had physically harmed A.R., he has taken responsibility for it by pleading guilty as opposed to going to trial. Finally, the state contends that the jury's

16.

not-guilty verdict with respect to the child endangering charge demonstrates that it reached its verdict based on evidence pertaining to the current charges—not past conduct.

{¶ 53} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington,* 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 54} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. To establish ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland* at 688-692. As recognized in *Strickland,* there are "countless ways to provide effective assistance in any given case."

17.

*Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 55} Moreover, in matters involving trial strategy, "courts will generally defer to the judgment of trial counsel, even where 'another and better strategy' might have been available." *State v. Newsome*, 11th Dist. Ashtabula No. 2003-A-0076, 2005-Ohio-3775, ¶ 8, quoting *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980). "A court will only consider reversing on these grounds where the choice of trial strategy so deviates from the standard of reasonableness 'that ordinary trial counsel would scoff at hearing of it.'" *Id.,* quoting *State v. Burgins*, 44 Ohio App.3d 158, 160, 542 N.E.2d 707 (4th Dist.1988).

{¶ 56} In *State v. Stalnaker*, 11th Dist. Lake No. 2004-L-100, 2005-Ohio-7042, ¶ 51-55, the court rejected the defendant's claim that his trial counsel was ineffective for opening the door to the introduction of other bad acts. It held that the allowance of other bad acts evidence involved trial strategy, and while it "clearly represented a questionable and risky trial strategy," "debatable strategic and tactical decisions will not form the basis of a claim for ineffective assistance of counsel, even if there had been a better strategy available." (Internal citations and quotations omitted.) *Id.* at ¶ 55. *See also State v. Parra*, 6th Dist. Lucas No. L-15-1290, 2017-Ohio-5761, ¶ 10 ("Ohio appellate courts have held that the scope of cross-examination clearly falls within the ambit of trial strategy and that debatable trial tactics do not establish ineffective assistance of counsel."); *State v. Reynolds*, 6th Dist. Lucas No. L-16-1080, 2018-Ohio-40, ¶ 71

18.

("Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel.").

{¶ 57} We reach the same conclusion here. While trial counsel's strategy may have been risky or debatable, we cannot say that it constituted ineffective assistance.

{¶ 58} Accordingly, we find Rybak's first assignment of error not well-taken.

## B. Crim.R. 29

{¶ 59} In his second assignment of error, Rybak argues that the trial court erred in denying his Crim.R. 29 motion for acquittal with respect to the charge of intimidation. He argues that (1) there was no direct evidence that A.R. was a "witness in the discharge of the person's duty," under R.C. 2921.03(A), at the time Rybak allegedly perpetrated the offense; (2) A.R., by her own admission, was not prevented from leaving the duplex or hindered with regard to contacting police; and (3) A.R.'s testimony that Rybak let the air out of her tires was unsubstantiated by any additional testimony.

{¶ 60} A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 61} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing

19.

the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978).

{¶ 62} R.C. 2921.03(A) provides that "[n]o person, knowingly and by force, by unlawful threat of harm to any person or property * * *, shall attempt to influence, intimidate, or hinder a * * * witness in the discharge of the person's duty." Rybak challenges virtually all the elements of this offense. He argues that A.R. was not a "witness in the discharge of the person's duty," Rybak did not use "force," and Rybak did not attempt to "influence, intimidate, or hinder" A.R.

{¶ 63} The state explains that the intimidation charge was based on Rybak's actions after A.R. announced that she was going to the police on December 16, 2017. It maintains that it was not required to prove that Rybak actually succeeded in preventing A.R. from contacting the police. And it insists that A.R. was a "witness in the discharge of the person's duty."

{¶ 64} The state urges that while the intimidation statute does not define "witness," the Ohio Jury Instructions define the term to mean "any person who has or claims to have knowledge concerning a fact or facts about the issue(s) involved in a proceeding." OJI CR 521.03. It cites case law holding that a victim is a "witness" as the

20.

term is used in R.C. 2921.03 even if no criminal "proceeding" has been instituted at the time the threat is made. *State v. Crider*, 21 Ohio App.3d 268, 269, 487 N.E.2d 911 (9th Dist.1984). Finally, with respect to the "duty" element of the offense, without citation to any Revised Code provision, the state maintains that A.R. owed a statutory duty to report Rybak's crime to the police.

{¶ 65} At trial, Rybak's counsel repeatedly argued that A.R. was not a "witness in the discharge of [a] duty" for purposes of R.C. 2921.03(A), and he requested a jury instruction defining "duty." As it does here, the state took the position that A.R. owed a duty to report Rybak's crime under R.C. 2921.22, so when she told Rybak that she was going to the police, she became a "witness in the discharge of [a] duty." In fact, because of the state's position that A.R. was obligated to report Rybak's criminal conduct, the trial court advised A.R. that she could face misdemeanor charges for failing to report Rybak's conduct, and appointed counsel to advise A.R. of her Fifth-Amendment right against self-incrimination.

{¶ 66} Ultimately, despite advising A.R. and appointing her counsel, the court found the state's position to be "misguided." It nevertheless concluded that the state presented sufficient evidence of a violation of R.C. 2921.03. It reasoned that once Rybak's downstairs neighbor contacted 9-1-1, law enforcement became involved and A.R. owed a duty to cooperate with law enforcement. As far as defining "duty" for the jury, the court told Rybak's counsel that it was going to inform the jury "that they shall use their common understanding of the word duty." It never did.

21.

{¶ 67} As the state argues, R.C. 2921.22(A)(1) provides that "no person, knowing that a felony has been or is being committed, shall knowingly fail to report such information to law enforcement authorities." Arguably, this statute could impose a duty on a victim to report that a felony has been committed against him or her. But that statute contains two exceptions that are important under the facts of this case. R.C. 2921.22(G) provides that:

> Divisions (A) and (D) of this section do not require disclosure of information, when any of the following applies:
>
> (1) The information is privileged by reason of the relationship between * * * husband and wife * * *.
>
> (2) The information would tend to incriminate a member of the actor's immediate family.

See *M.S. v. Harvey*, 5th Dist. Richland No. 13CA105, 2014-Ohio-4236, ¶ 36 ("[D]isclosure of information is not required when '[t]he information would tend to incriminate a member of the actor's immediate family.'"). A.R. was married to Rybak, so under R.C. 2921.22(G)(1) and (2), she owed no duty to report that he committed a felony against her.

{¶ 68} The state relies on *State v. Crider*, 21 Ohio App.3d 268, 487 N.E.2d 911 (9th Dist.1984) and *State v. Totarella*, 11th Dist. Lake No. 2002-L-147, 2004-Ohio-1175, as support for its position. Both of these cases are distinguishable.

{¶ 69} In *Crider,* the court held that a victim is a "witness" for purposes of R.C. 2921.03(A). Importantly, the court did not address the "discharge of [a] duty" element of

22.

the offense. In *Totarella*, the court upheld the defendant's intimidation conviction, which was premised on his threatening a neighbor who told him that she was going to call the police after observing him assault a woman. The court held that under R.C. 2921.22, the neighbor had a statutory duty to report what she saw to the police, and the defendant, "by unlawful threat of harm, attempted to hinder her in the discharge of that duty." *Id.* at ¶ 62. Unlike the present case, where Rybak and A.R. are married, there is no indication that the defendant and the neighbor in *Totarella* were in any way related.

{¶ 70} As for a duty to cooperate—the duty upon which the court based its ruling—this rationale is also flawed. First, while a person is prohibited from hampering or impeding an investigation under R.C. 2921.31 (obstructing official business), we are aware of no affirmative "duty to cooperate" with law enforcement. And more importantly, there was no evidence presented indicating that A.R. knew that the downstairs neighbor had called 9-1-1. So even if a duty to cooperate existed, it cannot be said that she was acting in discharge of this duty given that she did not know that any investigation had been initiated.

{¶ 71} Unfortunately, it seems that the state pursued the intimidation charge against Rybak under a statute that is inapplicable to the facts and circumstances of this case. An intimidation charge could more appropriately have been pursued under R.C. 2921.04, which prohibits a person from intimidating or attempting to intimidate a victim in the filing of criminal charges:

23.

(A) No person shall knowingly attempt to intimidate or hinder the victim of a crime * * * in the filing or prosecution of criminal charges * * *, and no person shall knowingly attempt to intimidate a witness to a criminal * * * act by reason of the person being a witness to that act.

(B) No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons:

(1) The victim of a crime * * * in the filing or prosecution of criminal charges * * *.

The state's decision to charge Rybak under R.C. 2921.03(A)—and its failure to prove that A.R. was a witness in the discharge of a duty—requires that we vacate Rybak's intimidation conviction.

{¶ 72} Accordingly, we find Rybak's second assignment of error well-taken.

### C. Manifest Weight

{¶ 73} In his third assignment of error, Rybak argues that with respect to both of his convictions, the jury's verdict was against the manifest weight of the evidence. He claims that because the case involved allegations of a pattern of brutality perpetrated over a period of time, the jury decided the case based on its sympathy for A.R. rather than on the evidence. He argues that the "highly emotional nature of the allegations caused the

24.

jury to lose its way and convict [him] strictly on the basis of A.R.'s testimony," whereas Rybak's own testimony fell "on deaf ears." Rybak also maintains that it was not proven that he caused A.R.'s injuries or that A.R. was a "witness" for purposes of the intimidation statute.

{¶ 74} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 75} Given our conclusion with respect to Rybak's second assignment of error, we need not address this assignment as it pertains to Rybak's intimidation conviction. But as it relates to his domestic-violence conviction, the jury was presented with two

different versions of events. It was free to believe A.R. or Rybak; it chose to believe A.R. Additionally, Officer Smith and Detective Hahn observed A.R. immediately after she fled the duplex, and their testimony corroborated A.R.'s version of events.

{¶ 76} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Here, we cannot say that the jury lost its way in resolving evidentiary conflicts in favor of the state.

{¶ 77} Accordingly, we find Rybak's third assignment of error not well-taken.

### III. Conclusion

{¶ 78} We find Rybak's first assignment of error not well-taken. Trial counsel's cross-examination of A.R., opening the door to evidence of Rybak's prior bad acts, was a strategy decision and does not support Rybak's claim for ineffective assistance of counsel.

{¶ 79} We find Rybak's second assignment of error well-taken. The state presented insufficient evidence that A.R. was a "witness in the discharge of [a] duty," therefore, Rybak's conviction for intimidation under R.C. 2921.04(A) must be vacated.

{¶ 80} We find Rybak's third assignment of error not well-taken. His domestic violence conviction was not against the manifest weight of the evidence.

26.

**{¶ 81}** We affirm, in part, and reverse, in part, the February 21, 2019 judgment of the Lucas County Court of Common Pleas. We vacate Rybak's intimidation conviction. The state is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed, in part, and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

Gene A. Zmuda, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.